**CSX TRANSPORTATION, INC., Plaintiff,**

v.

**GEORGIA PUBLIC SERVICE COMMISSION,**
**Defendant.**

**Civil No. 1:96–CV–0894–JEC.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 28, 1996.

Mary Taylor Tapley Daly, Nelson, Mullins, Riley & Scarborough, Atlanta, GA, Walter Holloway Bush, Jr., Arnall, Golden & Gregory, Macon, GA, for Plaintiff.

Thomas K. Bond, State of GA Law Dept., Alan Grantzhorn, Office of State Atty. Gen., James D. Fagan, Jr., Stanford, Fagan & Giolito, Atlanta, GA, for Defendant.

1. Railroad agencies are essentially local business offices in railroad-served cities and towns. (See Pl. Brief in Support of Mot. for Sum.J. [11] at 2.) Agents are responsible for things such as ticket sales, baggage handling, and customer information. (Id.) Plaintiffs point out that modern technology has decreased the demand for agencies, because customer service centers performing all

*ORDER*

CARNES, District Judge.

This case is presently before the Court on plaintiff CSX Transportation's (hereinafter "CSX") Motion for Summary Judgment [11], plaintiff Norfolk's Motion for Summary Judgment [14], Transportation Communication Union's (hereinafter "TCU") Motion to Intervene as a Defendant [15], plaintiff CSX's Motion for Leave to Amend Complaint [21], plaintiff Norfolk's Motion for Leave to Amend Complaint [24], and defendant Georgia Public Service Commission's (hereinafter "GPSC") Motion for Summary Judgment [18]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that plaintiffs' Motions to Amend their Complaints should be **GRANTED**, TCU's Motion to Intervene should be **GRANTED**, plaintiffs' Motions for Summary Judgment should be **GRANTED**, and defendants' Motions for Summary Judgment **DENIED**.

*BACKGROUND*

Defendant GPSC has regulated the operation of railroads in Georgia since 1897. (*See* Def. Brief in Support of Mot. for Sum. J. [18] at 2.) Pursuant to its regulatory authority under O.C.G.A. § 46–8–21, defendant has required railroads operating in Georgia to seek approval before modifying railroad services, including railroad agencies.[1]

The present dispute springs from defendant's refusal to grant plaintiffs approval to modify railroad agencies operated in Georgia. In May of 1995 plaintiff CSX filed an application with defendant to scale its Cordele agency down from two to one employees. (Compl. at 8.) A hearing was held on the Cordele application before defendant, ending in defendant's denial of the application. (*Id.*) Plaintiff Norfolk operates approximately 25 railroad agencies in Georgia for which defen-

of the functions of an agent can be, and to a large extent have been, computerized and centralized. (*Id.* at 2–5.) Plaintiff CSX has in fact closed its agencies in many states but has been unable to do so in Georgia. (*Id.*) Of the 16 agency offices plaintiff CSX currently maintains, 8 are located in Georgia. (*Id.* at 4.)

dant has denied permission to discontinue, and currently has approximately 50 applications pending before defendant requesting permission to modify other services or facilities in Georgia. (Compl. at 4.)

Plaintiffs contend that defendant's authority to regulate the modification or discontinuance of agencies in Georgia was terminated by Congress's passage of the ICC Termination Act of 1995, 49 U.S.C. § 10101, et seq. The ICC Termination Act went into effect on January 1, 1996. The Act was passed in an effort to reduce the regulation of railroads and other modes of surface transportation. *See* 49 U.S.C. § 10101. The Act abolished the Interstate Commerce Commission (hereinafter "ICC"), and created the Surface Transportation Board (hereinafter "STB") to perform some of the functions previously performed by the ICC. The Act also made several changes to its predecessor, the Staggers Rail Act, in line with the policy of Congress to decrease regulatory controls over the railroad industry. Plaintiffs contend that one of these changes is federal preemption of state regulatory control over railroad services such as agencies.

The parties agree that the preemptive effect of the ICC Termination Act is a question of law appropriate for resolution by summary judgment. They have filed cross motions for summary judgment on the issue whether defendant still has the authority to regulate agency closings in Georgia. (Compl. at 11.)

### DISCUSSION

#### I. *Jurisdiction*

Defendants do not contest the Court's jurisdiction over this litigation. Plaintiffs address the issue nevertheless, and the Court notes that it has jurisdiction to entertain the present suit under 28 U.S.C. § 1331 and the Supreme Court's opinion in *Shaw v. Delta Air Lines,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). In *Shaw,* the Court held that a plaintiff seeking injunctive relief from state regulation claimed to be preempted by a federal statute presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve. *Id.* at 96, 103 S.Ct. at 2899. Because plaintiffs' com-

plaints seek to enjoin the exercise of regulatory authority by GPSC, which plaintiffs claim has been preempted by the ICC Termination Act, plaintiffs' claims arise under federal law, and are within this Court's jurisdiction under 28 U.S.C. § 1331.

#### II. *Motion to Amend Complaint*

Plaintiffs have moved for leave to amend their original complaints pursuant to Fed.R.Civ.P. 15(a). Rule 15(a) provides that leave to amend "shall be freely given when justice so requires." The standard for allowing amendments under Rule 15(a) is a liberal one. *See Foman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (stating that "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits"); *Rosen v. TRW, Inc.,* 979 F.2d 191, 194 (11th Cir.1992) (holding that "where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice"); and *Shipner v. Eastern Air Lines, Inc.,* 868 F.2d 401, 406 (11th Cir.1989) (holding that leave to amend under Rule 15(a) should be granted unless substantial reason exists for its denial). The generally liberal standard for allowing amendments can be overcome by factors such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment." *Nolin v. Douglas County,* 903 F.2d 1546, 1550 (11th Cir.1990) (citing *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

None of these factors appear to be applicable to the present suit. Plaintiffs seek to amend their original complaints to name individual members of GPSC as defendants, instead of naming GPSC itself. The GPSC has in a recently filed motion for summary judgment asserted Eleventh Amendment immunity as a defense. (*See* Def. Mot. for Sum. J. [18] at 12.) As discussed *infra,* the Eleventh Amendment bars suit in federal

court against state agencies such as GPSC. An exception to Eleventh Amendment immunity was created by the Supreme Court's decision in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The doctrine of *Ex parte Young* allows a plaintiff to sue individual state officials for declaratory and injunctive relief to stop alleged continuing violations of federal law. The amendment plaintiffs request would allow plaintiffs to argue that their suit comes within the *Ex parte Young* exception to the Eleventh Amendment, and have this action resolved on the merits.

Given the liberal standard that district courts must use for allowing amendments, and the absence of any factors such as bad faith outweighing the policy of liberally allowing amendments[2], the Court finds that plaintiffs should be allowed to amend their complaints in order to press their argument that as amended their complaints come within the *Ex parte Young* exception to Eleventh Amendment immunity.

### III. *Motion to Intervene*

■ TCU has moved to intervene as a defendant in this action. It argues that it is entitled to intervene as a matter of right under FED.R.CIV.P. 24(a), or alternatively that the Court should use its discretion to allow permissive intervention under Rule 24(b). Rule 24(a) provides in relevant part that "upon timely application anyone shall be permitted to intervene in an action … when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." FED. R.CIV.P. 24(a). In order to intervene as of right under Rule 24(a) TCU must show: (1) that its application to intervene is timely; (2) that TCU has an interest relating to the property or transaction which is the subject

of the main action; (3) that disposition of the main action may cause practical harm to TCU; and (4) that TCU's interest is inadequately represented by existing parties. *Federal Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.,* 983 F.2d 211, 215 (11th Cir.1993) (citing *Chiles v. Thornburgh,* 865 F.2d 1197, 1213 (11th Cir.1989)). Although it is undisputed that TCU's motion to intervene is timely, plaintiffs challenge each of the remaining elements that TCU must show in order to intervene as of right.

### A. Interest

■ Although the Supreme Court has not articulated precisely the type of interest that is necessary for intervention as of right, it is clear that Rule 24(a) does not require that an individual have a property or economic interest or that an individual be bound by judgment in a case in order to intervene as of right. *See* 7C CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1908, at 283–84 (hereinafter "WRIGHT") (citing *Smuck v. Hobson,* 408 F.2d 175 (D.C.Cir.1969) (en banc)). The 1966 Amendments to Rule 24(a) were passed to eliminate these requirements, which were thought to be too restrictive. *Id.*

The Court finds that TCU has a sufficient interest in the present litigation to justify intervention under Rule 24(a). TCU is a union organization that represents railworkers in Georgia. It maintains that its members have a continuing interest in whether GPSC will continue to regulate railroads because its members are usually adversely affected by changes in services and facilities, particularly their discontinuance. GPSC's inability to regulate agency closings might in fact have a tangible effect on the employment of TCU's members, which the Court finds sufficient to satisfy the interest requirement of Rule 24(a).

### B. Practical Harm

■ An applicant for intervention shows practical harm by demonstrating that dispo-

---

**2.** Plaintiffs moved to amend their complaint as soon as defendant raised the 11th Amendment Immunity defense. (*See* Pl. Mot. to Amend Compl. [21] at 3.) The individual members of GPSC will not be prejudiced by this amendment because each member had notice of the suit from its inception and was served individually. (*Id.*) There is no evidence of any bad faith on the part of plaintiffs, or prejudice to defendant.

sition of the main case would put the applicant at a practical disadvantage in protecting his or her interest in the case. *See* WRIGHT § 1908, at 302. The stare decisis effect of a judgment may create practical harm sufficient to meet the requirements of Rule 24(a). *Id.* In deciding whether TCU has shown that it will suffer practical harm from disposition of the main suit, the relevant question is whether resolution of the main suit favorably to plaintiff will render the interest claimed by TCU worthless for all practical purposes. *See Atlantis Dev. Corp. v. United States,* 379 F.2d 818, 828 (5th Cir.1967) (holding that development company's claim to ownership of islands would become worthless if United States prevailed on its claim to exclusive ownership of islands).

■ If this Court decides that GPSC regulation is preempted by the ICC Termination Act, assuming that holding is "approved by the Supreme Court after an appeal to it and thereafter it is either affirmed or not taken for review on cert.," TCU's defense of GPSC's authority to regulate will be worthless. *Id.* Thus the failure to allow TCU an opportunity at this point to advance its own legal theories and arguments in support of GPSC's continuing authority to regulate railroads in Georgia will as a practical matter impair its ability to protect the interest of its members in GPSC's continued regulation.

## C. Inadequate Representation

■ The burden on an applicant for intervention to show inadequate representation by existing parties is minimal. *Trbovich v. United Mine Workers,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972). If the applicant's interest is similar to but not identical with that of one of the parties, he ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation for the absentee litigant. WRIGHT § 1909, at 319. In this case the litigant which plaintiff asserts adequately represents TCU's interest is a government agency. The Eleventh Circuit has found that the interests of a government entity "are likely to diverge from those of a private intervenor," as to such issues, for example, as the amount of money "which will be expended in litigation in order to defend the existing system." *Meek v. Dade County,* 985 F.2d 1471, 1478 (11th Cir.1993) (reversing district court's failure to allow private litigant to intervene and holding county's representation of interests of private litigant inadequate). In *Meek* the Eleventh Circuit joined several other courts in recognizing the risk of inadequate representation by a governmental entity. *See Dimond v. District of Columbia,* 792 F.2d 179, 192 (D.C.Cir.1986) (recognizing inadequacy of government representation of private parties in certain circumstances due to government's duty to represent public interest of citizens); *Natl. Farm Lines v. ICC,* 564 F.2d 381, 384 (10th Cir.1977) (stating that government agency's protection of not only interest of public but also private interest of petitioner was "a task which on its face is an impossible burden"). Given the minimal burden of showing inadequate representation, and the potential divergence between the interests or arguments of the private litigant TCU and the governmental entity GPSC, the Court finds that TCU has made a sufficient showing that its interests are not adequately represented by GPSC for the purposes of Rule 24(a).

Accordingly, the Court concludes that TCU has demonstrated that it fulfills all of the requirements for intervention as of right under Rule 24(a).[3]

**3.** Having found TCU to meet the requirements for intervention as of right under Rule 24(a), the Court need not consider TCU's argument regarding permissive intervention under Rule 24(b). The Court notes, however, that it would have allowed TCU to intervene permissively under 24(b) had the requirements of 24(a) not been met. Under Rule 24(b) the Court may in its discretion allow a party to intervene when there are common questions of law or fact. FED. R.CIV.P. 24(B). In exercising its discretion the court considers whether the intervention will un-duly delay or prejudice the adjudication of the rights of the original parties. *Id.* It does not appear that adding TCU as a defendant would delay or complicate resolution of the question that is central to this action, whether the ICC Termination Act of 1995 preempts GPSC's authority to regulate agency closings. TCU has provided the Court with additional briefing on this issue, which can only be helpful to the court in resolving the matter. Because TCU was prompt in filing its application to intervene, no

## IV. *Cross Motions for Summary Judgment*

### A. Summary Judgment Standard

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. at 2552–53; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence [4] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. at 2510. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. at 2510–11. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

### B. GPSC's Motion for Summary Judgment Based on Eleventh Amendment Immunity

■■■ Defendants argue that the present suit is barred by the Eleventh Amendment. The Eleventh Amendment immunizes states, and state agencies which are considered "arms of the state," from being sued in federal court. *Robinson v. Dept. of Transp.,* 966 F.2d 637, 638 (11th Cir.1992). Plaintiffs do not dispute that GPSC is an arm of the state of Georgia subject to the protection of Eleventh Amendment immunity. Although Eleventh Amendment immunity can be waived by the state or abrogated by Congress in certain situations, it does not appear, and plaintiffs do not argue, that the immunity has been waived or abrogated by Congress in the present case. *See Robinson,* 966 F.2d at 640 (noting that Georgia constitution expressly

---

prejudice can result to any party from its addition as a defendant.

**4.** The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

reserves Georgia's immunity in federal court and citing Ga.Const., Art. I, Sec. 2, ¶ 9); and *Dellmuth v. Muth,* 491 U.S. 223, 230, 109 S.Ct. 2397, 2401, 105 L.Ed.2d 181 (1989) (holding that Congress must make its intention to abrogate a state's 11th Amendment immunity unmistakably clear).

■ Plaintiffs argue instead that this case comes within the exception to Eleventh Amendment immunity created by the Supreme Court in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The doctrine of *Ex parte Young* is said to have created a "gaping hole in the shield of sovereign immunity created by the Eleventh Amendment." *Saltz v. Dept. of Employment Security,* 976 F.2d 966, 968 (5th Cir.1992); *See also Gamble v. Dept. of Health and Rehab. Services,* 779 F.2d 1509, 1511 (11th Cir.1986) (describing *Ex parte Young* doctrine as creating a "significant exception to Eleventh Amendment immunity"). In *Ex parte Young* the Court reasoned that acts by state officials which are contrary to federal law cannot have been authorized by the state, and concluded that suits seeking to enjoin wrongful acts by such officials are not suits against the state and can be entertained by the federal court. *Saltz,* 976 F.2d at 968.

In order to come within the exception to Eleventh Amendment immunity created by *Ex parte Young,* a lawsuit must be brought against individuals in their official capacities as agents of the state, and must seek only prospective and declaratory or injunctive re-

lief. *Id.* The Court has granted leave to plaintiffs to amend their complaints to name the individual members of GPSC as defendants instead of naming GPSC itself, and plaintiffs seek only prospective declaratory and injunctive relief to prevent continuing violations of the Supremacy Clause. Thus plaintiffs' complaints, once amended, will come within the doctrine of *Ex parte Young.* The Court thus finds that this suit is not barred by the Eleventh Amendment.[5]

## C. Preemption [6]

■ The central dispute in this case is whether the ICC Termination Act of 1995 preempts GPSC's authority to regulate railroad agency closings in Georgia. Preemption doctrine is rooted in the Supremacy Clause of the United States Constitution. *Teper v. Miller,* 82 F.3d 989, 993 (11th Cir. 1996); *See* U.S. Const. Art. VI, cl. 2. Because it requires that conflicts between state and federal law be resolved in favor of federal law, the Supremacy Clause prohibits the enforcement of any state law that conflicts with a valid federal statute. *Taylor v. General Motors Corp.,* 875 F.2d 816, 821 (11th Cir.1989) (citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152–53, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)).

The Eleventh Circuit discussed the proper framework for resolving preemption questions in *Teper v. Miller,* 82 F.3d 989 (11th Cir.1996). In *Teper,* the court recognized that there are three categories of preemp-

---

**5.** Defendants cite *Seminole Tribe v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), as limiting the *Ex parte Young* doctrine. *Seminole Tribe* is inapplicable to the present case. In *Seminole Tribe* the statute which the Court was interpreting, the Indian Gaming Regulatory Act, set up a comprehensive remedial scheme abrogating states' 11th Amendment immunity. The Court held the remedial scheme unconstitutional after finding that Congress had no authority to abrogate states' 11th Amendment immunity under its Commerce Clause powers. *Id.* at ——, 116 S.Ct. at 1118. Although the Court expressly reaffirmed the *Ex parte Young* doctrine, the Court refused to apply it because it did not want to supplement the remedial scheme created by Congress with one created by the judiciary. *Id.* at ——, 116 S.Ct. at 1132. Congress did not attempt to abrogate states' 11th Amendment immunity in the ICC Termination Act by setting up a comprehensive remedial

scheme. The Court's decision in *Seminole Tribe* thus provides no authority to refuse to apply the *Ex parte Young* exception to 11th Amendment immunity in the present case.

**6.** Although both parties have submitted letters of individual congressmen "interpreting" the ICC Termination Act, the Court has not considered these letters in its analysis. As the opinions of individuals expressed after passage of the Act, the letters do not provide the Court with probative evidence of the preemptive effect of the ICC Termination Act. *See Bread Political Action Committee v. Federal Election Committee,* 455 U.S. 577, 582, 102 S.Ct. 1235, 1238, 71 L.Ed.2d 432 (1982) (holding sworn affidavits of senators who prepared original draft expressing their view on coverage of statute cannot be given probative weight because it represents only personal views of legislator).

tion: (1) express preemption, where Congress defines explicitly the extent to which its enactments preempt state law; (2) field preemption, where Congress's regulation of a field is so pervasive or the federal interest so dominant that an intent to occupy the entire field can be inferred; and (3) conflict preemption, where state law stands as an obstacle to the accomplishment of the full purposes and objectives of a federal statute. *Id.* at 993 (citing *English v. General Elec. Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990)). The Court noted that the overriding principle which should guide any preemption analysis is whether Congress intended to preempt state law. *Id. See Medtronic v. Lohr,* —— U.S. ——, ——, 116 S.Ct. 2240, 2255, 135 L.Ed.2d 700 (1996) (stating that purpose of Congress is "ultimate touchstone" in every preemption case) (citing *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992)); and *Illinois Commerce Commission v. ICC,* 879 F.2d 917, 921 (D.C.Cir.1989) (noting that critical question in any preemption analysis is "whether Congress intended that federal regulations supersede state law").

 Plaintiffs argue that the ICC Termination Act of 1995 expressly preempts GPSC's authority to regulate railroad agency closings in Georgia. The intent of Congress to expressly preempt state law is "primarily discerned from the language of the preemption statute and the statutory framework surrounding it." *Medtronic,* —— U.S. at ——, 116 S.Ct. at 2255 (1996). The policy behind the federal statute, as well as its legislative history, may also be relevant in determining whether Congress intended the statute to preempt state law. *Id.*

 The Court thus begins its inquiry into the preemptive effect of the ICC Termination Act by looking at the plain language of the Act. The ICC Termination Act contains an express preemption clause. That clause provides:

> Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b)(2).

It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations. Regulation of railroad agency closings certainly seems to come within "regulation of rail transportation," which is expressly preempted by section 10501(b)(2).

Defendants, however, read the ICC Termination Act's preemption clause to preempt state remedies only when federal remedies are provided under the Act. (*See* Def. Brief in Support of Mot. for Sum.J. [18] at 6.) Defendants thus reason that the Act does not preempt state regulation of railroad agency closings because the Act provides no federal remedy for railroad agency closings. (*Id.*) Defendants' argument reflects a misunderstanding not only of the plain language of section 10501(b)(2), but also of the ICC Termination Act generally. The most natural reading of section 10501(b)(2) is that the federal remedies provided by the ICC Termination Act are the only remedies available as to the regulation of rail transportation, and that the federal remedies are exclusive of state remedies except where the ICC Act has expressly provided otherwise. *See* S.Rep. No. 176, 104th Cong., 1st Sess. 14 (1995) (explaining that ICC Termination Act "should not be construed to authorize states to regulate railroads in areas where federal regulation has been repealed by the bill"); and H.R.Conf.Rep. No. 422, 104th Cong., 1st Sess. 167 (1995), U.S.Code Cong. & Admin.News 1995, pp. 793, 852 (stating that "integrated into the statement of general jurisdiction is the delineation of the *exclusivity* of federal remedies with respect to the regulation of rail transportation") (emphasis added).

Interpreting the preemption clause in the ICC Termination Act to be broad enough to preempt state regulation of agency closings is consistent with the Act's grant of exclusive jurisdiction over almost all matters of rail regulation to the STB. The Act grants exclusive jurisdiction to the STB over:

> (1) transportation by rail carriers, and the remedies provided in this part with respect

to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and,

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. § 10501(b)(1) & (2). "Transportation" as used in section 10501(b)(1) is defined very expansively in the Act to include:

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

49 U.S.C. § 10102(9)(A) & (B).

Railroad agencies come within the ICC Termination Act's definition of "transportation by rail carriers" over which the STB is given exclusive jurisdiction under 49 U.S.C. § 10501(b)(1). Railroad agencies, it is undisputed, "are typically located in depots or other buildings owned by the servicing railroad. They are staffed by railroad employees who serve customers in the receipt or shipment of goods in interstate commerce. These agents keep track of shipment information for customers, delivery dates, complete work orders for customers, handle demurrage charges and switching issues, and order empty equipment for the customers that the agent serves." (Pl. Reply in Support of Pl.Mot. for Sum.J. [22] at 20, citing transcripts of hearings before GPSC.) This description of the function of railroad agencies overlaps substantially with the definition of "transportation by rail carriers" in section 10102(9)(B) as including "storage, handling and interchange of passengers and property."

Railroad agencies also seem to fit within any common understanding of "services" of railroads, over which the STB is given exclusive jurisdiction in 49 U.S.C. § 10501(b)(1).[7] Indeed, defendants offer no argument as to how agencies and the functions they perform could possibly fall outside of any definition of the term "service." Moreover, plaintiffs point out that agencies have historically been referred to in a number of ways, including "customer service centers". (Pl. Reply in Supp. of Mot. for Sum.J. [22] at 15, citing transcripts of hearings before GPSC.)

Despite what appears to be an incredibly wide grant of exclusive jurisdiction to the STB to regulate railroad operations, defendants argue that agency closings are not within the purview of the STB's exclusive jurisdiction. In making this argument, defendants' primarily rely on the fact that the ICC Termination Act does not specifically use the term "agency" in 49 U.S.C. § 10501(b) listing the matters over which the STB has exclusive jurisdiction. Defendants contend that Congress's failure to use the term "agency" in section 10501, especially considering Congress's specificity in the same code section as to its intent to grant the STB exclusive jurisdiction over intrastate spur and side tracks, is evidence that Congress did not intend to preempt state regulatory authority over agencies. (Def. Brief in Support of Sum.J. [18] at 6.)

The Court finds this argument unconvincing. As discussed, it is clear to the Court that Congress intended the preemptive net of the ICC Termination Act to be broad by extending exclusive jurisdiction to the STB over anything included within the general and all inclusive term "transportation by rail carriers." 49 U.S.C. § 10501(b)(1). The

7. Plaintiffs also correctly point out that GPSC's own rules appear to define agencies as railroad "services." GPSC Rule 1–3–1–.05 is entitled: Rates and Services As Required by the Commission. That rule provides that facilities, privileges, and services now in effect may not be discontinued without the consent of the Commission. Rule 1–12–1–.31 then provides: "no such depot, station, office or *agency*, aforesaid, now established, or that hereinafter may be established ... shall be closed ... without authority of the Commission upon written application." (*See* Pl.Reply in Support of Mot. for Sum.J. [22] at 22.)

Court will not ignore Congress's use of broad terms which include railroad agencies, such as "transportation by rail carriers" and "services" related to rail transportation, merely because Congress specifically denoted its intent to preempt state regulatory authority of wholly intrastate spur and side tracks in the same code section. Intrastate spur and side tracks were explicitly excluded from federal jurisdiction in the ICC Termination Act's predecessor, the Staggers Rail Act. *See Illinois Commerce Commission v. ICC,* 879 F.2d 917, 921 (D.C.Cir.1989) (recognizing that intrastate spur abandonments were explicitly placed within exclusive jurisdiction of states and outside jurisdiction of ICC under Staggers Rail Act). Given the states' exclusive jurisdiction over spur and side tracks under the Staggers Rail Act, it is understandable that Congress proceeded with extreme clarity in making federal jurisdiction over intrastate tracks exclusive in the ICC Termination Act. Thus Congress's specificity as to intrastate tracks does not detract from its use of widely inclusive terms such as "transportation by rail carriers" in the ICC Termination Act's preemption clause and statement of the STB's exclusive jurisdiction. There is no basis on which to argue that Congress intended to carve out regulatory control over agencies as an exception to its otherwise broad preemption of state regulation of railroad operations.

Interpreting 49 U.S.C. § 10501(b) to expressly preempt state regulation of railroad agencies is consistent with the purpose, and the underlying policy, of the ICC Termination Act. The ICC Termination Act was passed as part of a trend towards deregulating the railroad industry. *See* S.Rep. No. 176, 104th Cong., 1st Sess. 3 (1995) (recognizing that ICC Termination Act would significantly reduce regulation of surface transportation industries in this country and discussing financial problems of rail industry caused by overregulation). The policy statement of the ICC Termination Act emphasizes competition within and deregulation of the railroad industry. A section of the Act entitled Rail Transportation Policy provides:

In regulating the railroad industry, it is the policy of the United States Government—

(1) To allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

(4) To ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense;

(7) To reduce regulatory barriers to entry into and exit from the industry.

49 U.S.C. § 10101. GPSC's recent denial of plaintiffs' attempt to close agencies in Georgia illustrates one way in which state regulation can interfere with Congress's attempt to "reduce regulatory barriers to entry into and exit from the [railroad] industry." *Id.* By preempting state regulation of railroad operations, and granting exclusive jurisdiction over the regulation of almost all aspects of railroad operations to the STB, Congress removes the ability of states to frustrate its policy of deregulating and reviving the railroad industry.

In implementing its deregulatory policy, the ICC Termination Act made several changes to its predecessor, the Staggers Rail Act. These changes provide further evidence of Congress's intent to preempt state regulatory authority over railroad agencies in the ICC Termination Act. The Staggers Rail Act provided a federal certification procedure for states which wanted to regulate intrastate rail rates, rules or practices. *See Southern Pacific Transp. v. Public Utilities Commission,* 716 F.2d 1285, 1287 (9th Cir. 1983) (explaining that sections 11501 and 11502 of Staggers Rail Act required that a state authority seeking to exercise jurisdiction over intrastate railroad matters apply for federal certification). The ICC Termination Act repealed the sections formerly providing for state certification. The STB recently explained in a public notice that state certification was no longer necessary because "the underlying state regulatory role no longer exists." (STB Public Notice, Ex Parte No. 388, April 3, 1996, attached to

Pl. Brief in Support of Sum.J. [11] at Ex. "D".) The ICC Termination Act also deleted language from the policy statement of the Staggers Rail Act dealing with regulatory cooperation between the federal and state governments, and removed sections of the Staggers Rail Act providing for joint federal and state regulatory bodies. *See* S.Rep. No. 176, 104th Cong., 1st Sess. 44 (1995) (discussing ICC Termination Act's deletion of former 49 U.S.C. §§ 10101, 10341–10344 and describing former sections as outdated).

Perhaps the most significant change to the Staggers Rail Act, which the Court has already discussed, is the ICC Termination Act's express removal from the states of jurisdiction over wholly intrastate railroad tracks. The Staggers Rail Act conferred authority on the states to regulate wholly intrastate tracks. *See Illinois Commerce Commission*, 879 F.2d at 921 (holding that Staggers Rail Act explicitly excluded from its jurisdiction "spur, industrial, team, switching, or side tracks if the tracks are located ... entirely in one State" and citing former 49 U.S.C. § 10907(b)(1) (1982)). Even after finding that the states had jurisdiction over intrastate tracks under the Staggers Rail Act, the Court in *Illinois Commerce Commission* stated that the Staggers Rail Act was among the most pervasive and comprehensive of federal regulatory schemes. *Id.* With the extension of exclusive federal jurisdiction over wholly intrastate tracks, one of the few railroad matters previously within the jurisdiction of the states, the ICC Termination Act evinces an intent by Congress to assume complete jurisdiction, to the exclusion of the states, over the regulation of railroad operations. *See* H.R.Conf.Rep. No. 422, 104th Cong., 1st Sess. 167 (1995), U.S.Code Cong. & Admin.News 1995, p. 852

(explaining that only state regulation of non-rail matters, for example in state criminal statutes, is not preempted by ICC Termination Act because state regulation of nonrail matters does not "generally collide with the scheme of economic regulation (and deregulation) of rail transportation").

Finally, the Court's interpretation of the ICC Termination Act as preempting GPSC's authority to regulate agency closings is supported by the STB's interpretation of the ICC Termination Act. As discussed, the STB recently issued a public notice which stated "that the authority of certain states to regulate intrastate rail matters was terminated by the ICC Termination Act of 1995, effective January 1, 1996." (STB Public Notice, Ex Parte No. 388, April 3, 1996, attached to Pl.Mot. for Sum.J. [11] at Ex. "D".) The STB's notice explained that the new law differed in several respects from the old and that the old certification regime was no longer necessary as "the underlying state regulatory role no longer exists" and the "exclusive jurisdiction of the Board extends to transportation between a place in a State and a place in the same state as part of the interstate rail network." *Id.*[8]

As the agency with authority delegated from Congress to implement the provisions of the ICC Termination Act, the STB is "uniquely qualified to determine whether state law ... should be preempted." *Medtronic*, —— U.S. at ——, 116 S.Ct. at 2255. The STB's interpretation of the Act is persuasive and corroborative of the Court's own, and in accord with the only other judicial interpretation of the preemptive effect of the ICC Termination Act of which the Court is aware.[9]

8. Although the Court agrees with the STB's interpretation of the ICC Termination Act, and finds it persuasive, the Court does not agree with plaintiffs that it is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, the Court notes that the law is unsettled as to the application of *Chevron* to an agency's determination of its own jurisdiction. *Teper*, 82 F.3d at 998. Also, *Chevron* is only applicable "where the plain meaning of the express terms of a statute is unclear." *Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782. Because

the Court finds that Congress has spoken directly to the issue of the preemptive effect of the ICC Termination Act, the *Chevron* framework is irrelevant.

9. This issue has to this date only received attention by the Nebraska Supreme Court. *See In re Application of Burlington Northern R. Co. v. Page Grain Co.*, 249 Neb. 821, 545 N.W.2d 749 (1996) (holding that ICC Termination Act preempts state jurisdiction over regulation of railroad operations, including agencies).

The Court finds that the language of the ICC Termination Act expresses a clear intent on the part of Congress to preempt state regulatory authority over railroad agency closings. The policy underlying the Act, as well as its purpose and legislative history support this conclusion. That the STB, as well as the only court considering the issue to this point, have reached the same conclusion as to this issue reinforces the Court's confidence in its interpretation of the ICC Termination Act to preempt state regulatory authority over railroad agency closings.

## D. Commerce Clause

■ Defendants argue that Congress's preemption of state regulatory authority over agencies, as well as wholly intrastate tracks, exceeds its authority to regulate under the Commerce Clause. Defendants contend that wholly intrastate station agencies and tracks lack the substantial effect on interstate commerce necessary to authorize Congress's exclusive regulation of them under its Commerce Clause powers. Defendants cite recent Supreme Court authority indicating that the Court has become more serious about the requirement that an activity substantially affect interstate commerce before Congress regulates it. (*See* Def. Brief in Support of Mot. for Sum.J. [18] at 8) (citing *United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); and *Seminole Tribe v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)).

Defendant's argument regarding the Commerce Clause is without merit. Congress's authority to regulate even intrastate aspects of the operation of railroads is beyond question. *See Arizona v. Atchison, Topeka and Santa Fe R. Co.*, 656 F.2d 398, 407 (9th Cir.1981) (stating that "where the legitimate end of Congress is to revitalize the nation's railroads by limiting a state's ability to assess railroad property even that is wholly within one state, Congress is within its Commerce Clause powers"); *Preseault v. ICC*, 853 F.2d 145 (2d Cir.1988) (holding that Congress's authority to regulate railroads is well recognized, as is its authority to regulate railroad abandonments); *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37, 57 S.Ct. 615, 624,

81 L.Ed. 893 (1937) (recognizing that intrastate activities can by reason of close relation to interstate commerce fall within federal control, as "demonstrated by the case of carriers who are engaged in both interstate and intrastate transportation"); *Southern R. Co. v. United States*, 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911) (recognizing power of Congress to regulate boxcars traveling exclusively intrastate because of their inherent mobility and connection to interstate commerce). States, in fact, only have the authority to regulate railroads in the *absence* of federal regulation. *Illinois Commerce Commission*, 879 F.2d at 921.

Congress has authority to regulate even intrastate aspects of the operation of railroads because railroads are instrumentalities of interstate commerce. *See United States v. Bishop*, 66 F.3d 569, 588 (3d Cir.1995) (holding that Congress can regulate motor vehicles as an instrumentality of interstate commerce and stating "the Supreme Court has made clear that airplanes, railroads, highways and bridges constitute instrumentalities of commerce which Congress can regulate under the commerce clause"). Congress has more authority to regulate instrumentalities of interstate commerce because instrumentalities of interstate commerce, as the means of transporting goods and people across state lines, have an inherently substantial effect interstate commerce. *Id.* Congress may regulate threats to instrumentalities of interstate commerce even though the threat comes only from intrastate activities. *Id.*

The Court's recognition of Congress's authority to regulate even intrastate aspects of railroads is not undercut by recent Supreme Court cases limiting Congress's power to regulate under the Commerce Clause. *See United States v. Lopez*, —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *Lopez* the Supreme Court invalidated the Gun Free School Zones Act of 1990 because the Act "neither regulate[d] a commercial activity nor contain[ed] a requirement that [gun] possession be connected in any way to interstate commerce." *Id.* at ——, 115 S.Ct. at 1626. The Court expressly recognized that when complete regulation of interstate commerce required incidental regulation of intrastate

commerce, the Commerce Clause authorized such regulation. *Id.* at ——, 115 S.Ct. at 1627 (citing *Houston, E. & W.T.R. Co. v. United States,* 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914)). Thus in *Lopez* the Court did not cut back on its prior recognition of Congress's power under the Commerce Clause, but merely "declined to proceed any further." *Id.* —— U.S. at ——, 115 S.Ct. at 1634. *See Bishop,* 66 F.3d at 581 (upholding federal carjacking statute and rejecting argument that *Lopez* "created a bright line rule that unless an activity is commercial or economic it is beyond the power of Congress to regulate").

Congress's regulation of intrastate railroad agencies and tracks under the ICC Termination Act of 1995 is "part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631. Moreover, railroads are instrumentalities of interstate commerce over which Congress's authority to regulate even purely intrastate

matters under the Commerce Clause has not been and cannot be doubted. Accordingly, the Court finds that Congress's preemption of state regulatory authority over intrastate tracks and agencies is a valid exercise of Congress's authority to regulate under the Commerce Clause.

### *CONCLUSION*

For the foregoing reasons, Plaintiffs' Motions for Leave to Amend their Complaints are **GRANTED,** TCU's Motion to Intervene as Defendant is **GRANTED,** Plaintiffs' Motions for Summary Judgment are **GRANTED,** and Defendant's Motion for Summary Judgment is **DENIED.**