BURLINGTON NORTHERN SANTA FE
CORPORATION; Burlington Northern
Railroad Company, Plaintiff,

v.

Bob ANDERSON, Commissioner of MT
Dept of Public Service Commission;
Dave Fisher, Commissioner of MT Dept
of Public Service Commission; Nancy
McCaffree, Commissioner of MT Dept of
Public Service Commission; Danny
Oberg, Commissioner of MT Dept of
Public Service Commission; Bob Rowe,
Commissioner of MT Dept of Public Ser-
vice Commission; Defendant,

and

Transportation Communications
International Union,
Intervenor/Defendant,

and

United Transportation Union,
Intervenor/Defendant.

No. CV 96–55–H–CCL.

United States District Court,
D. Montana,
Helena Division.

March 24, 1997.

Betty J. Christian, Carolyn D. Clayton, Steptoe & Johnson, Washington, DC, Leo Berry, Mark D. Etchart, Browning, Kaleczyc, Berry & Hoven, PC, Helena, MT, Janice G. Barber, Sarah J. Whitley, Burlington Northern Santa Fe, Fort Worth, TX, for Burlington Northern Santa Fe Corp. and Burlington Northern R. Co.

Martin Jacobson, Montana Public Service Com'n, Helena, MT, for Bob Anderson, Dave Fisher, Nancy McCaffree, Danny Oberg and Bob Rowe.

Peter M. Meloy, Meloy & Morrison, Helena, MT, Clinton J. Miller, III, Daniel R. Elliott, III, United Transp. Union, Cleveland, OH, for United Transp. Union.

Turner C. Graybill, Graybill, Ostrem & Crotty, Great Falls, MT, Joseph Guerrieri, Jr., Guerrieri, Edmond & Clayman, Washington, DC, for Transportation–Communications Intern. Union.

## ORDER

LOVELL, District Judge.

This matter came on for hearing on February 21, 1997 on Plaintiffs' and Defendants' cross motions for summary judgment. Intervenor Defendants Transportation Communications International Union (TCU) and United Transportation Union (UTU) were represented by separate counsel at the hearing but did not participate in oral argument.

Upon consideration of the arguments, the motions and the briefs submitted herein, the court is prepared to rule on the cross motions.

### ISSUE

The issue before the court is whether The Interstate Commerce Commission Termination Act of 1995 (ICCTA or Act), 49 U.S.C. §§ 10501, et seq., preempts Montana law authorizing the Montana Public Service Commission (MPSC) to exercise regulatory authority over railroad agencies in Montana.

### BACKGROUND

Burlington Northern Railroad Company (BN), a subsidiary of Burlington Northern Santa Fe Corporation (BNSF), has long been engaged in interstate and intrastate railroad business in Montana and neighboring states. In that capacity, BN has maintained agencies, or business offices, in various cities and towns served by the railroad.[1] The MPSC historically has regulated BN's intrastate economic activities, including the closure of agencies.

Section 69–1–110 of the Montana Code Annotated provides in pertinent part:

> (3) The commission may adopt rules to govern its proceedings and to regulate the mode and manner of all investigations and hearings concerning railroad companies and other parties before it in the establishment of rates, orders, charges, and other acts required of it under the law.

Mont.Code Ann. § 69–1–110 (1995). Also, section 69–14–111 provides for MPSC supervision of railroads engaged in the transportation of passengers or property in Montana. Mont.Code Ann. § 69–14–111 (1995). Section 69–14–117 authorizes the MPSC to compel railroads subject to its authority to provide reasonable accommodations and services to the public. Mont.Code Ann. § 69–14–117 (1995). Under section 69–14–202, such railroads must maintain and staff shipping and passenger facilities to the extent that they were maintained on January 1, 1987, unless upon proper showing and after the opportunity for public hearing, the MPSC finds that the facility is not necessary for public convenience. Mont.Code Ann. § 69–14–202 (1995). Finally, section 69–14–1001 provides for protection of employees affected by closure, consolidation, or centralization of a "station or other facility." Mont.Code Ann. § 69–14–1001 (1995). Pursuant to this statutory scheme, the MPSC has promulgated regulations requiring railroad companies to seek and receive MPSC approval before discontinuing station agents, abandoning stations on main or branch lines or abandoning or removing sidetrack or spur track. Mont. Admin. R. 38.4.301 (1995).

In accordance with this Montana law, BN has in the past filed applications with the MPSC for authority to discontinue railroad agencies in the Montana communities of Eureka, Froid, Kalispell, and Shelby. The MPSC denied all of the applications, twice in the cases of the Eureka and Froid agencies, the latest of the orders being served on September 18, 1995. BN proposes, due to extensive modernization and centralization of services, to discontinue nine agencies in Montana by September 1997.[2]

The ICCTA became effective on January 1, 1996. The Act amended certain sections of Title 49 of the United States Code, which governs the economic regulation of railroads. Following the effective date of the Act, the MPSC considered the impact that the Act has on the MPSC. The MPSC determined that the Act does not clearly preempt its regulation of agencies and that it would continue to regulate railroad activities as it has in the past.

Plaintiffs filed their complaint on August 2, 1996, requesting a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Act preempts Montana law under which Defendants exercise jurisdiction over the maintenance, closure, consolidation or centralization of railroad shipping facilities, stations and station agencies in Montana. Plaintiffs also

---

1. The agencies, commonly referred to as "depots" in Montana's rural setting, are located on railroad property and are staffed with railroad clerical employees.

2. The existing BN agencies in Montana are located at Eureka, Froid, Glendive, Great Falls, Havre, Kalispell, Shelby, Sweet Grass and Whitefish.

seek injunctive relief, pursuant to 28 U.S.C. § 2202 and Fed.R.Civ.P. 65, preventing Defendants from exercising their authority under the Montana statutes in regulating said railroad activities. On August 23, 1996, TCU filed a motion to intervene as a party defendant. The following week, on August 27, Plaintiffs and Defendants filed simultaneous motions for summary judgment. Then, on August 29, UTU filed its motion to intervene. The court granted the motions by TCU and UTU, and the matter was set for hearing on the summary judgment motions.

### DISCUSSION

■ The court has jurisdiction over this case under 28 U.S.C. § 1331, as Plaintiffs' claim asserting federal preemption of a state regulation arises under the Constitution and laws of the United States, in particular, the Supremacy Clause, Art. VI, Clause 2. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983).

Under Rule 56(b) of the Federal Rules of Civil Procedure, summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to prevail as a matter of law. Fed.R.Civ.P. 56(b); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The parties agree that there are no genuine issues of material fact and that the matter is ripe for resolution by summary judgment. The only issue is whether the Act preempts state authority to regulate the economic activities of railroads in the state of Montana, specifically the discontinuance of railroad agencies.

This case arises from the MPSC's refusal to grant BN's application to discontinue certain railroad agencies and from MPSC's finding that the ICC Termination Act of 1995 does not affect its economic regulation of railroad activities in Montana. Plaintiffs contend that Defendants' authority to regulate the maintenance, closure, consolidation or centralization of railroad shipping facilities, stations and station agencies in Montana was terminated on January 1, 1996, the effective date of the Act.

Defendants argue that the Act does not express or imply federal preemption of state regulation in regard to railroad agencies. In essence, they argue that since the Act does not specifically, in so many words, provide preemption of state regulation of agencies, the court must find that no preemption exists.

■ Article VI of the United States Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art VI, cl. 2. As such, any state law that conflicts with federal law is "without effect." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). In determining a preemption issue, however, the district court must proceed from the presumption that the historic police powers of the state are not to be superseded by a federal act unless preemption is found to be "the clear and manifest purpose of Congress." *Id.* at 516, 112 S.Ct. at 2617; *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977).

■ The Supreme Court, in *English v. General Electric Co.,* 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990), identified three circumstances in which state law is preempted by federal law: (1) express preemption, where Congress explicitly defines the extent to which its enactments preempt state law; (2) field preemption, where state law regulates conduct in a field that Congress intended the federal government to exclusively occupy; and (3) conflict preemption, where it is impossible to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *English,* 496 U.S. at 78–80, 110 S.Ct. at 2274–76. The overriding consideration is whether Congress intended to preempt state law. *Medtronic v. Lohr,* —— U.S. ——, ——, 116 S.Ct. 2240, 2255, 135 L.Ed.2d 700 (1996); *English,* 496 U.S. at 80, 110 S.Ct. at 2275–76.

■ The court should find preemption if the intent of Congress either is explicitly stated in the statute's language or is implicitly contained in its structure and purpose.

*Shaw,* 463 U.S. at 95, 103 S.Ct. at 2899. This doctrine is tempered, however, by caveats against assuming that preemption exists based solely on general statements and broad implications of national policy. *See Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 634, 101 S.Ct. 2946, 2962, 69 L.Ed.2d 884 (1981) (citing *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981)).

Interpretations of the recently-enacted Act are limited, but they provide assistance to this court. First, and most persuasive to this court's determination, is the decision of the United States District Court for the Northern District of Georgia, *CSX Transp., Inc. v. Georgia Pub. Serv. Comm'n,* 944 F.Supp. 1573 (1996). That court considered the specific issue now before this court, and found that the ICCTA, specifically 49 U.S.C. § 10501(b)(2), expressly preempted state economic regulation of railroad operations. That court rejected the defendants' argument that the Act preempts state remedies only where federal remedies are provided under the Act, holding that "the most natural reading of section 10501(b)(2) is that the federal remedies provided by the ICC Termination Act are the only remedies available as to the regulation of rail transportation, and that the federal remedies are exclusive of state remedies except where the ICC Act has expressly provided otherwise." *CSX Transp.,* 944 F.Supp. at 1581. The court found that railroad agencies come within the Act's definition of "transportation by rail carriers." *Id.* at 1582. The district court also found express preemption to be consistent with the purpose and the underlying policy of the Act, which is to promote deregulation of the railroad industry. *Id.* at 1583. I agree.

Similarly, the Surface Transportation Board (Board), in a public notice discontinuing state recertification proceedings instituted under the former Interstate Commerce Commission, interpreted the Act:

> The *new law* ... differs in several important respects from the *old law* .... For present purposes, it suffices to note that the certification regime of old 49 U.S.C. § 11501(b)(2)–(5) no longer exists, because

the underlying State regulatory role no longer exists. *See* new 49 U.S.C. § 10501(a)(2)(A) (jurisdiction of the Board extends to transportation between a place in a State and a place in the same State as part of the interstate rail network), and new 49 U.S.C. § 10501(b) (jurisdiction of the Board is exclusive). It follows that the certifications ... that were effective as of December 31, 1995, ceased to be effective as of January 1, 1996. We are therefore discontinuing the [recertification] proceedings heretofore instituted....

*State Intrastate Rail Rate Auth.,* Pub.L. No. 96–448, Ex Parte No. 388, Surface Transportation Board (served April 3, 1996). Plaintiffs argue that this reflects the Board's interpretation of the Act as generally preempting state economic regulation of railroads. Defendants, however, point out that this statement was issued specifically in reference to rate-setting and the necessary certification for that authority, and not concerning the regulation of agencies.

Two state courts have interpreted the preemptive provisions of the Act, and both have found federal preemption of state regulation regarding agency closures. First, in *Burlington Northern Railroad Co. v. Page Grain Co.,* 249 Neb. 821, 545 N.W.2d 749, (1996), the Nebraska Supreme Court held that:

> [s]tate courts no longer have jurisdiction to consider the practices, routes, services, and facilities of interstate rail carriers because § 10501(a) of the federal ICC Termination Act of 1995 grants the federal Surface Transportation Board with exclusive jurisdiction over transportation by rail carriers as part of the interstate rail network.

*Burlington Northern Railroad,* 545 N.W.2d at 751. Second, a Georgia court found that the Georgia Public Service Commission lacked the power to determine a railroad's application to modify an agency. *CSX Transp., Inc. v. Georgia Pub. Serv. Comm'n,* Civil Action No. E–47557, Ord. at 1 (Ga.Super. Ct. June 20, 1996). That court found clear and total preemption of state economic regulation of railroad activity. *Id.* at 3. Defendants and Intervenor Defendant TCU argue that these courts erred in interpreting

the new federal statutes and that both courts misconstrue the language of the Act.

█ In further support of their preemption argument, Plaintiffs offer state agency orders from Virginia and Arkansas. *See Application of CSX Transp., Inc.,* Case No. RRR950002 (Feb. 15, 1996), issued by the Virginia State Corporate Commission; *In re: In the Matter of Application of DeQueen & Eastern Railroad Co. to Discontinue its Agency Station in Dierks, Arkansas,* Case No. R–4340, Report and Order at 1–3 (June 14, 1996) (appeal pending). Both agencies found that the regulation and remedies relevant to agency stations are under, since the enactment of the ICCTA, the exclusive jurisdiction of the federal government.[3]

█ The first consideration by this court is whether there is express language in the Act whereby Congress clearly and unequivocally preempted state regulation regarding railroad agencies. Congress' intent to expressly preempt state law is "primarily discerned from the language of the preemption statute and the statutory framework surrounding it." *Medtronic,* — U.S. at ——, 116 S.Ct. at 2255. Also, the court should consider the policy behind the federal statute and the legislative history in determining congressional intent. *Id.*

In the Act, Congress granted the newly-established Surface Transportation Board jurisdiction over railroad transportation in both interstate and intrastate commerce. 49 U.S.C. § 10501. Subsection 10501(b) provides:

> (b) The jurisdiction of the Board over—
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

Further, section 10101 sets out as rail transportation policy the government's intent to minimize the need for federal regulation of the rail transportation system. 49 U.S.C. § 10101(2). Also, the Act uses expansive definitions for the terms "railroad" and "transportation." Section 10102(6) defines "railroad" as including in pertinent part:

> (C) a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation.

49 U.S.C. § 10102(6)(C). The definition of "transportation" includes:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail ... and
>
> (B) services related to that movement, including receipt, delivery, ... and interchange of passengers and property....

49 U.S.C. § 10102(9)(A), (B). And finally, "rail carrier" is defined as "a person providing common carrier railroad transportation for compensation...." 49 U.S.C. § 10102(5). Thus, when section 10501(b) grants exclusive jurisdiction to the Board over "transportation by rail carriers," it logically includes the agency as the terminal, property, facility, depot, and services related to the movement or interchange of passengers.

---

3. Both Plaintiffs and Intervenor/Defendant TCU have submitted letters of individual members of Congress purporting to interpret the ICCTA. The court has not considered these letters in its determination of the instant motions. The letters express the views of individuals concerning the preemptive force of the Act; thus they hold no probative value to the court. *See Bread Political Action Comm. v. Fed. Election Comm.,* 455 U.S. 577, 582, 102 S.Ct. 1235, 1238–39, 71 L.Ed.2d 432 (1982); *CSX Transp.,* 944 F.Supp. at 1580 n. 6.

Additional support for finding that agencies are included in transportation by rail carriers may be found in relevant Montana statutory and regulatory law. Section 69–14–111 provides for general supervision by the state commissioners over "all railroads ... and any common carrier engaged in the transportation of passengers and property in this state...." Mont.Code Ann. § 69–14–111. Section 69–14–202 states the duty of the railroad to provide shipping and passenger *facilities,* and to accommodate the passengers in such *facilities* as were maintained and staffed on January 1, 1987. Mont.Code Ann. § 69–14–202(1). Subsection 69–14–202(2) goes on to provide for a public hearing before the closure, consolidation, or centralization of the *facility.* Mont.Code Ann. § 69–14–202(2).

Further, Montana law grants the MPSC authority to protect employees in closures, consolidation or centralization of stations or facilities. Mon.Code Ann. § 69–14–1001. And, finally, the MPSC's own regulation speaks in terms of stations and station agents in requiring railroad companies to seek and receive MPSC approval before discontinuing station agents, abandoning stations on main or branch lines or abandoning or removing sidetrack or spur track. Montana Administrative Rule 38.4.301 (1995). Thus, throughout the text of its relevant statutes, Montana law describes or identifies railroad agencies as facilities.

■ Defendants and Intervenor Defendant TCU argue that it is not reasonable that Congress intended to include station agencies within its meaning of "transportation by rail carriers" and "services" related to rail transportation in its preemption statute because the Act specifically refers to preemption of state regulatory authority of intrastate spur and side tracks, with no specific inclusionary language about agencies. Previous federal law, however, explicitly excluded intrastate spur and side tracks from federal jurisdiction; thus the reasonableness of specifying the preemption of state authority over this property without specific mention of station agencies. Legislative history supports this analysis, as Congress noted that the "Federal scheme of economic regulation and deregu-

lation is intended to address and encompass *all* such regulation and to be completely exclusive." H. Rep. No. 104–311, 104th Congress, 1st Session, Part A, at 96 (1995), U.S. Code Cong. & Admin. News at 793, 808. The express preemption clause of the ICCTA encompasses regulation of railroad agencies.

■ The second circumstance enumerated in *English* is field preemption, which is closely intertwined with the doctrine of express preemption. To identify the domain preempted by federal law in a case where the State has traditionally occupied a particular field, the court should apply two considerations: (1) whether the historic police powers of the State have been superseded by the "clear and manifest purpose of Congress;" and (2) "a fair understanding of congressional purpose." *Medtronic,* —— U.S. at ——–——, 116 S.Ct. at 2250–51 (internal quotes and citations omitted). A "preempted field" is defined in reference to the purpose of the state law, or whether the state law has some direct and substantial effect on the regulated field. *English,* 496 U.S. at 84–85, 110 S.Ct. at 2278; *see also Gade v. Nat'l Solid Wastes Management Ass'n,* 505 U.S. 88, 89–90, 112 S.Ct. 2374, 2378–79, 120 L.Ed.2d 73 (1992).

■ The ICCTA contains an express preemption clause, providing that the remedies stated thereunder with respect to regulation of rail transportation are exclusive and that those remedies preempt the remedies provided under federal or state law. The Act reserves no area of regulation for the individual states—agency regulation or otherwise. As noted in *CSX Transp.,* the most natural reading of section 10501(b)(2) is that the federal remedies are the only remedies available as to the regulation of rail transportation. *See* 944 F.Supp. at 1581. This reading is consistent with and supported by legislative history noting congressional intent regarding exclusivity of regulation. *See Gade,* 505 U.S. at 111, 112 S.Ct. at 2390 (Congress' intent primarily discerned from language of pre-emption statute and "statutory framework" surrounding it); H. Rep. No. 104–311, 104th Congress, 1st Session, Part A, at 96.

In this case, state regulation of the closure, consolidation or centralization of agencies has a direct and substantial effect on the field of economic regulation of railroad transportation. Thus, the state regulation at issue falls squarely in the preempted field of economic regulation, and it affects the policy of deregulation of railroad transportation. The statutory language and accompanying legislative record evidence Congress' clear and manifest intent to occupy the entire field of economic regulation of rail transportation, including the regulation of railroad agencies.

 The third circumstance enumerated in *English* is that of "conflict preemption." 496 U.S. at 79, 110 S.Ct. at 2275. Preemption may be found where "it is impossible for a private party to comply with both state and federal requirements, ... or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (omitting internal quotations and citations). Again, this third circumstance is closely related to and intertwined with express preemption and field preemption. Under *English,* a state law that falls within a preempted field "conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." Id. at 79 n. 5, 110 S.Ct. at 2275 n. 5. Here, although hypothetically it may be possible, as Defendants argue, for a party to comply with both state and federal requirements, state regulation of Plaintiffs' actions with regard to agencies in Montana clearly would stand as an obstacle to Congress' stated purpose of deregulation of rail transportation. *See* 49 U.S.C. § 10101; H. Rep. No. 104–311, 104th Congress, 1st Session, Part A, at 96; *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Thus, state regulation of agencies in Montana conflicts with federal law intended to occupy the entire field at issue.

In sum, a court may find that a state's ability to regulate a field of law is preempted by federal law under any one of the three circumstances enumerated by the *English* Court. In the case at bar, I find all three circumstances present. Therefore, the ICC-TA preempts Montana law authorizing the MPSC to exercise regulatory authority over railroad agencies in Montana. Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' motion for summary judgment is GRANTED and Defendants' motions for summary judgment are DENIED.

The court will enter an appropriate judgment. Plaintiffs shall forthwith lodge a proposed judgment serving a copy of same on Defendants who shall file objections thereto, if any, by March 31, 1997.

The clerk is directed forthwith to notify the parties of entry of this order.