**FLORIDA EAST COAST RAILWAY COMPANY, a Florida corporation, Plaintiff,**

v.

**CITY OF WEST PALM BEACH, a Florida municipal corporation, Defendant.**

No. 00–8198.

United States District Court, S.D. Florida, Northern Division.

July 27, 2000.

Stuart H. Singer, Boies, Schiller & Flexner LLP, Hollywood, FL, for Plaintiff Florida East Coast Ry.

Claudia M. McKenna, Deputy City Attorney, City of West Palm Beach, Office of

City Attorney, West Palm Beach, FL, for Defendant City of West Palm Beach.

Carlos A. Velasquez, Montero, Finizio, Velasquez and Reyes, P.A., Ft. Lauderdale, FL, for Third–Party Defendant Rinker Materials Corp.

## ORDER

MIDDLEBROOKS, District Judge.

The question presented in this case is whether federal law preempts a municipality's application of its zoning and licensing ordinances to activities taking place on property owned by a railroad within the city. The railroad contends that the activities constitute an intermodal operation used by or in connection with a railroad. The city's mayor, on the other hand, describes the activity as a rock/aggregate business unrelated to transportation, initiated as part of a real estate transaction between the railroad and its largest customer. Both the railroad and the city request declaratory judgments on the preemption issue. In addition, the railroad seeks injunctive relief.

### I. Historical Background

The railroad has played an important and interesting role in the history of Southeastern Florida, particularly the City of West Palm Beach. However, the railroad's geographic location along the eastern ridge of the state through a highly developed urban corridor significantly impacts a number of municipalities and their residents.

Henry Morrison Flagler arrived in Florida in the winter of 1883—1884, having amassed a fortune as one of the founders of the Standard Oil Company. Florida E. Coast Ry. Co., *The Story of a Pioneer: A Brief History of the Florida East Coast Railway & Associated Enters.* 8 (1995) (hereafter *"Pioneer"*). He set out to develop luxury hotels, hoping to create an "American Riviera" in St. Augustine, Florida and induce America's elite to spend their winter vacations there rather than in the South of France or Italy. *Id.* at 9.

Flagler appreciated that to make his vision a reality, he needed better transportation facilities to move the immense quantities of building materials necessary to construct his empire of hotels and, later, to transport the people he hoped to attract. *Id.* at 11. To that end, on December 31, 1885, Flagler purchased the bonds of the little Jacksonville, St. Augustine, and Halifax River Railway. *Id.* This railway would grow to become the Florida East Coast Railway and play a central role in the early development of Florida's East Coast. *Id.*

When Flagler set his ambitious plan of development in motion, Southern Florida was undeveloped and unsettled. As the *East Coast Messenger* commented in its December 9, 1886 issue, "In surveying the route, [another early railroad developer] encountered not a single house or sign of habitation for the first forty miles, and only at one or two points was there a sign of a settlement." *Id.* Indeed, in the early years of operation, a wire fence spanned nearly the length of the Railway to keep roving cattle from crossing over the tracks. *Id.* From 1881 to 1885 only 776 miles of railroad were added to the then-existing 537 miles in Florida. Edward Nelson Akin, Southern Reflection of the Gilded Age: Henry M. Flagler's System, 1885—1913 49 (1975) (unpublished Ph.D. dissertation, University of Florida) (hereafter "Akin").

As Flagler continued to acquire smaller rail lines, extending his reach further south, Flagler sought out sources of traffic, especially freight traffic. *Id.* at 15. He looked to the agricultural region along the Indian River, where oranges and pineapples were being grown in commercial quantities. *Id.* He reasoned that a direct line down the coast would be superior to the existing route up the Indian River by steamer and then inland by rail. *Id.* Desirous of the increased property values a railway would bring, landowners granted the railroad rights-of-way. *Id.* By the end of 1892, Flagler changed the name of

the railroad to the Jacksonville, St. Augustine & Indian River Railway [1] and graduated from acquiring railroads to building them. *Id.* at 16.

At this time, Palm Beach was the site of a small settlement and post office, but no settlement existed where the City of West Palm Beach now stands. *Id.* at 17. The railroad lured travelers to this region through booklets describing it as a tropical Eden. *Id.* Coconut palms, not native to Florida, but grown from nuts that washed ashore from the wreckage in 1879 of a Spanish brig, the *Providencia,* added to the region's tropical beauty. Akin at 74; *Pioneer* at 17. Recognizing this beauty, Flagler announced in 1893 his plans to build a railroad into the Lake Worth Area. Akin at 75. In addition, he purchased the famed McCormick homestead, transforming it into what would become the large and luxurious Royal Poinciana Hotel in 1894. *Pioneer* at 18. When news of this planned development spread, real estate values surged, rising to as much as $1,000 an acre. *Id.* Sales that year in the Lake Worth area totaled $50,000. Akin at 75. What had been an inaccessible pioneer settlement became Palm Beach, "The Queen of Winter Resorts." *Pioneer* at 19. During the summer of 1895, Flagler commenced construction of the Palm Beach Inn, later called the Breakers. *Id.*

By March 22, 1894, the railroad reached as far south as the new village of West Palm Beach. *Id.* at 21. West Palm Beach was located on the mainland shore of Lake Worth, across from Palm Beach, where Flagler had purchased the farm of a Captain Porter and adjoining land. *Id.* Flagler offered lots for sale, which were quickly bought up. *Id.* Soon residents and investors arriving by train populated the area. *Id.* By November 1894, West Palm Beach was an incorporated town of over one thousand people and had a post office, newspaper, ice factory, and stores of all kinds. *Id.* Flagler financed water-

works projects and jointly financed a town hall and school. *Id.* He also built a hospital and a Catholic church. Akin at 76.

Today, the City of West Palm Beach is the largest municipality within Palm Beach County with over 76,000 residents. The railroad, which has discontinued passenger traffic, extends throughout the city in what is described by the mayor as a "corridor of blight." The railroad property at issue in this case bisects one of the oldest residential areas of West Palm Beach abutting two predominantly African–American communities targeted by the city for renewal and redevelopment efforts.

## II. Findings of Fact

Plaintiff Florida East Coast Railway Company (hereafter "FEC") owns approximately 24.5 acres of property at 601 15th Street in West Palm Beach, Florida. The 15th Street yard consists of five switching tracks, an office complex, warehouses and storage facilities, and two loading/unloading tracks. At various times since 1926, FEC has used the yard as a freight yard and switching terminal. Since at least 1940, portions of the property have also been used for the storage and transfer of commodities in commerce. Among the functions that have been performed there are the switching and classification of railcars, repair of freight cars, track maintenance activities, signaling, railway police, storage, and other related railroad activities.

From approximately 1984 until October 1999, FEC used the 15th Street yard as a trailer on flat car ("TOFC") and container on flat car ("COFC") intermodal facility. The TOFC/COFC operations featured arrival, during day and night, of trains with containers and trailers. These containers and trailers would be offloaded, stored temporarily on the ground at the yard, and picked up by truck. Citing "diminishing business activity and cost of system enhancements . . . , along with marginal reve-

---

**1.** On September 7, 1895, the name of the railway was changed to Florida East Coast

Railway, the name under which it has since operated. *Pioneer* at 27.

nue per unit," FEC decided to cease inter-modal operations at the 15th Street yard effective October 1, 1999. FEC 217. FEC decided to relocate the TOFC/COFC operation to the Port of Palm Beach and in March 1999 began discussing a property exchange with Rinker Materials Corporation ("Rinker"). Rinker, which is in the business of supplying building materials such as aggregate, the primary feedstock of cement, would swap its ready-mix plant located at 7th Street in West Palm Beach for FEC's 15th Street property. Upon further discussion, the parties instead entered into a standard lease agreement and a standard trackage agreement on November 3, 1999. Under these agreements, which were for 99 years but terminable upon 30 days notice, FEC leased to Rinker a side track and approximately 21 acres of the 15th Street property, which included the existing office building. Rinker planned to use the 15th Street property "as an aggregate distribution facility receiving unit trains of limerock." FEC 205. Rinker's 15th Street aggregate distribution operation commenced on January 4, 2000.

This FEC–Rinker arrangement differed from earlier ones involving the parties. Prior to these agreements, Rinker would excavate, pulverize, and sort aggregate at its quarries in Miami–Dade County and then hire FEC to transport the aggregate to locations throughout the state. In addition, FEC would deliver aggregate to Rinker at a number of locations in the greater Palm Beach County area, including Boca Raton, Lake Park, Jupiter, and Rinker's 7th Street facility. Rinker is FEC's single largest customer. Of the 90,000 railcars carrying over eight million tons of aggregate that FEC has transported over the past three years, a large percentage has been transported for Rinker. In total, FEC has generated over $35 million transporting aggregate over this period.

The parties instituted the new arrangement reasoning that it would be more effi-cient for FEC to centralize Rinker's aggregate shipments to the 15th Street yard, from which the aggregate could be trucked to other locations. Thus, instead of moving the aggregate to its final destination, FEC simply moved the aggregate from the quarries in Miami–Dade County to 15th Street. FEC's sole responsibility was for transporting the aggregate from Miami to West Palm Beach. Rinker covered the rest, including unloading and reloading the aggregate at the yard for shipment to final destinations. As FEC waybills and bills of lading indicated, when FEC took the aggregate from Miami, the aggregate's destination was the 15th Street yard. From that point forth—from unloading the aggregate at the yard to reloading it and moving it out by truck to final destinations—FEC was not involved.

Rinker effectively ran a Rinker operation on FEC property. Signs at 15th Street read "CSR Rinker Aggregate Distribution" until they were replaced sometime after February 14, 2000 and before March 8, 2000 by a sign reading "FEC Distribution Terminal." Under the arrangement, FEC trains from Miami delivered up to 40 railcars of aggregate from Miami to the 15th Street yard, where they were backed onto the side track within the property leased by Rinker. The aggregate was then unloaded. Herzog Corporation, a company providing unloading equipment and services throughout the country, handled the unloading under contract to Rinker. After being unloaded, the aggregate was stockpiled on the ground and organized by type and grade. Trucks either owned or hired by Rinker arrived, were loaded with aggregate, weighed, and dispatched to various destinations, including other Rinker facilities in the area. Weighing and dispatching were performed by Rinker employees.

Rinker also provided equipment—a $79,000 scale to weigh the aggregate and a $7,000 backhoe—paid its share of 15th Street utilities, and incurred other expenses directly. Rinker was responsible

for two Florida Power & Light electricity accounts, three City of West Palm Beach water accounts, and landscape maintenance. On January 5, 2000, Rinker was billed $295.18 for telephone service at 601 15th Street. On February 28, 2000, FEC invoiced Rinker for reimbursement of water bills at 601 15th Street in the amounts of $109.82 and $381.55. Bell South invoiced Rinker for phone service at 601 15th Street in the amount of $228.05.

In addition to the employees weighing and dispatching aggregate, Rinker stationed Enrique Chavez in the 15th Street office building to coordinate Rinker's operations. Mr. Chavez retrieved fax messages from various Rinker locations indicating the amount of aggregate to be shipped to those locations; communicated with Rinker truck drivers and independent truckers by microphone located within the dispatch office at 15th Street; read the weight of trucks filled with aggregate from a scale; printed delivery tickets for trucks at or below legal weight; and presented the delivery ticket for the truck driver to sign.

On February 17, 2000, the City issued Cease and Desist Orders to FEC and Rinker for operating a business that did not conform to the West Palm Beach Zoning Code. Under the West Palm Beach Code, the zoning for the area including the 15th Street yard is Multifamily High Density (MF 32) Residential. That same day, the City also served Rinker with a Notice of Violation of 18–7 of the City Code of Ordinances, charging Rinker with unlawfully operating a business without an occupational license. A hearing on the alleged violations was held on March 9, 2000 before Special Master Richards. On March 13, 2000, the Special Master found that FEC and Rinker were in violation of the zoning ordinance by operating or allowing the operation of "a rock/aggregate business" on the 15th Street premises. The Special Master also found Rinker in violation of the City Code for operating without a license. FEC and Rinker were each ordered to cease and desist or face fines of $1,000 per day.

As a result of the Special Master's orders, FEC and Rinker suspended operations at the 15th Street yard. While FEC and Rinker would prefer to operate in the manner they operated in January and February, FEC is prepared, if necessary, to run the operations through its employees and contractors. In fact, FEC and Rinker have entered into a contract for FEC to provide rail transport to and transloading of aggregate at the 15th Street yard. FEC commenced this action on March 8, 2000, seeking injunctive and declaratory relief against the City's enforcement actions, arguing that they are preempted by federal law. FEC sought a Temporary Restraining Order or Preliminary Injunction against the City. The City filed a counterclaim, also seeking declaratory relief. Rinker, which voluntarily dismissed its motion to intervene, was joined as third-party defendant by the City. The Court denied the motions for temporary relief in light of its order expediting trial on the merits of this action.

## III. Conclusions of Law

### A. Jurisdictional Issues

■ As a threshold matter, the Court finds FEC's action for declaratory and injunctive relief justiciable. This matter presents a present case and controversy, for the City has not changed its ordinance, and the orders of the Special Master remain in effect. *See* U.S. Const. art. III, § 2. The parties affected by the order have expressed their intention to resume the operations in question, and have begun to do so. Moreover, the case was not rendered moot by Rinker's temporary cessation of operations at the 15th Street yard. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 1390, 146 L.Ed.2d 265 (2000) (rejecting mootness claim based on cessation of conduct, stating that "[a] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.' ");

*California Coastal Com'n v. Granite Rock Co.,* 480 U.S. 572, 575, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987) (holding rock mining company's federal preemption challenge to certain state laws was not rendered moot because its five-year plan of operations had expired; company was likely to submit new plans for future mining operations.); *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982) (recognizing " voluntary cessation of a challenged practice does not deprive federal court of its power to determine the legality of the practice"). At a minimum there exists a controversy "capable of repetition yet evading review," were the FEC and Rinker to resume operations and the City were to again take enforcement steps, as it has indicated it would do. *See California Coastal Com'n,* 480 U.S. at 577, 107 S.Ct. 1419.

### B. Federal Regulation of the Railroads and Preemption

#### 1. Historical regulation of the railroad industry

Federal regulation of the railroad industry dates back to the late 19th and early 20th centuries when the railroads exercised a virtual monopoly over transportation. H. Rep. No. 104–311, 90 (1995), U.S.Code Cong. & Admin.News 1996, P. 793. At that time, the railroads were able to exert their will over the shippers and communities they serviced. *Id.* To protect against the power of the railroads, Congress asserted federal authority over the railroads, passing the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), which, as amended, still governs federal regulation of railroads. It has been recognized as "among the most pervasive and comprehensive of federal regulatory schemes." *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 318, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981).

With the emergence of the trucking industry, as well as the pipeline and barge industries, the railroads no longer wielded monopoly power. H. Rep. No. 104–311, 90 (1995), U.S.Code Cong. & Admin.News 1996, P. 793. Continued onerous federal regulation coupled with stiff competition nearly crippled the railroads, pushing the industry to the brink of financial collapse. *Id.* In response, Congress moved to deregulate the industry, beginning by enacting the Staggers Rail Act in 1980. *Id.* In addition to easing federal control over the railroads, the Staggers Rail Act continued Congress's practice of reducing the regulatory authority of the states over the railroad industry. As the Supreme Court noted, the Congressional exemption of rail carriers from state and municipal regulation was "clear, broad and unqualified." *Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 127–134, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991).

In 1995, Congress eliminated what little remained of state and local regulatory authority over railroad operations through enactment of the Interstate Commerce Commission Termination Act ("ICCTA" or "the Act"), codified at 49 U.S.C. § 701 *et seq.* As one federal district court has stated with respect to the ICCTA, "It is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations." *CSX Transp., Inc. v. Georgia Public Service Comm'n,* 944 F.Supp. 1573, 1581 (N.D.Ga.1996). Indeed, the Act's legislative history makes plain Congress's intent to shield railroads from state regulation while at the same time lessening federal regulation of the railroad industry:

> Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass *all* such regulation and to be completely exclusive. Any other construction would undermine the uniformity of Federal standards and risk the balkanization and subversion of the Federal scheme of minimal regulation for

this intrinsically interstate form of transportation.

H.R.Rep. No. 104–311, at 96 (1995), U.S.Code Cong. & Admin.News 1996, P. 793 (emphasis in original).

The policy statement of the ICCTA focuses upon fostering competition within the railroad industry through deregulation, providing in pertinent part as follows:

In regulating the railroad industry, it is the policy of the United States Government—

(1) To allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;

. . .

(4) To ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers and with other modes, to meet the needs of the public and the national defense; . . .

(7) To reduce regulatory barriers to entry into and exit from the industry.

49 U.S.C. § 10101.

### 2. The law of preemption

■ At issue here is whether Congress intended the preemptive effect of the ICCTA to reach the facts of this case. Preemption of state and local law by federal law is required by the Supremacy Clause of the U.S. Constitution, which provides that "the Laws of the United States . . . shall be the Supreme Law of the Land." U.S. Const. Art. XI, cl. 2. Any state or local law that conflicts with federal law is "without effect" and must give way. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 515, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); *see also Teper v. Miller*, 82 F.3d 989, 993 (11th Cir.1996). The principles of federalism dictate that preemption should not be found unless preemption is "the clear and manifest purpose of Congress." *Teper*, 82 F.3d at 993 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). To be "clear and manifest," however, does not necessarily require Congress's intent to be "express;" congressional intent can be implied from the structure and purpose of a statute. *Id.*

■ Preemption exists in three forms: (1) "express," where Congress defines explicitly the extent to which its enactments preempt state law; (2) "field," in which Congress's regulation of a field is so pervasive or the federal interest is so dominant that an intent for federal law to occupy the field exclusively can be inferred; and (3) "conflict" preemption, where federal and state law so conflict that is impossible for a party simultaneously to comply with both, or where state law prevents the accomplishment of the full purposes and objectives of federal law. *See Teper*, 82 F.3d at 993 (internal citations omitted). Determining the preemptive effect of the ICCTA on the City's zoning and licensing requirements requires juxtaposing these provisions, demarcating their respective scopes, and evaluating the extent to which they are in tension. *Id.*

In this matter, the Court is presented with the task of interpreting a statutory provision that expressly preempts state law. Section 10501 of the Act provides as follows:

(a)(1) Subject to this chapter, the [Surface Transportation] Board has jurisdiction over transportation by rail carrier that is—

(A) only by railroad; or

(B) by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment . . .

(b) The jurisdiction of the Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. *Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.*

49 U.S.C. § 10501 (emphasis added). The expansive reach of this preemption clause—to cover matters "with respect to regulation of rail transportation"—and the stated purposes of the ICCTA are also suggestive of field preemption.

Although the Court need not go beyond the language of § 10501 to determine whether Congress intended the ICCTA to preempt at least some state law, the Court must nevertheless "identify the domain expressly pre-empted" by that language. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 484, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (quoting *Cipollone,* 505 U.S. at 517, 112 S.Ct. 2608). Although this analysis begins with the Act's text, the Court's interpretation of the text "does not occur in a contextual vacuum." *Id.* at 485, 116 S.Ct. 2240.

▮ The interpretation is informed by two presumptions. *Id.* First, there is a presumption, especially in fields where the states have traditionally reigned, that "the historic police powers of the State were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.; see also Rice,* 331 U.S. at 230, 67 S.Ct. 1146. This approach comports with notions of federalism and the historic place held by the states in the regulation of health and safety. *Id.* This principle gives way, however, where what is at issue is regulation of an area where there has been a history of significant federal presence. *See United States v. Locke,* 529 U.S. 89, 120 S.Ct. 1135, 1147, 146 L.Ed.2d 69 (2000).

▮ Second, the analysis of a statute's preemptive scope is guided by the principle that "the purpose of Congress is the ultimate touchstone" in every preemption case. *Medtronic,* 518 U.S. at 485, 116 S.Ct. 2240 (citing, *e.g., Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608). Congress's intent is discerned primarily from the statute's language and its "statutory framework." *Id.* at 486, 116 S.Ct. 2240. Also relevant are the "structure and purpose of the statute as a whole," *id.* (quoting *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)), "as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law," *id.* The intent or purpose of the law said to be preempted, however, is immaterial; its effect governs. *See Teper,* 82 F.3d at 995. Under the Supremacy Clause, if the state or local law "in effect substantially impedes or frustrates federal regulation, or trespasses on a field occupied by federal law," it "must yield, no matter how admirable or unrelated the purpose of that law." *Id.* (citing *Gade,* 505 U.S. at 105, 112 S.Ct. 2374 ("In assessing the impact of a state law on the federal scheme, we have refused to rely solely on the legislature's professed purpose and have looked as well to the effects of the law."); *Felder v. Casey,* 487 U.S. 131, 138, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (" '[T]he relative importance to the State of its own law is not material when there is a conflict with a valid federal law,' for 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.' ")).

The broad scope of the ICCTA's preemptive reach is evidenced by the expansive definitions Congress has given the terms "transportation" and "railroad." *See Soo Line R.R. Co. v. City of Minneapolis,* 38 F.Supp.2d 1096, 1099 (D.Minn. 1998). "Transportation" is defined as—

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

49 U.S.C. § 10102(9)(A) & (B). "[R]ailroad" is defined to include—

(A) a bridge, car float, lighter, ferry, and intermodal equipment used by or in connection with a railroad;

(B) the road used by a rail carrier and owned by it or operated under an agreement; and

(C) a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation;

49 U.S.C. § 10102(6).

Indeed, the preemption language in the ICCTA is so broad that the Court must be careful not to adopt an "uncritical liberalism" when interpreting it. *See Federation of Advertising Industry Representatives, Inc. v. City of Chicago,* 189 F.3d 633, 636 (7th Cir.1999). In discerning congressional intent from this language, the Court is guided by the Supreme Court's analysis of § 514 of the Employee Retirement Income Security Act ("ERISA"), a preemption clause similarly broad in scope:

The governing text of ERISA is clearly expansive. Section 514(a) marks for preemption "all state laws insofar as they ... relate to any employee benefit plan" covered by ERISA, and one might be excused for wondering, at first blush, whether the words of limitation ("insofar as they ... relate") do much limiting. If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for

"[r]eally, universally, relations stop nowhere," H. James, Roderick Hudson xli (New York ed., World's Classics 1980). But that, of course, would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality ... We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive.

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655–56, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). The Court of Appeals for the Seventh Circuit has found the language "with respect to advertising and promotion" to be similarly broad in scope. *See Federation of Advertising,* 189 F.3d at 637. Following the lead of the Supreme Court and the Seventh Circuit, we are mindful that to view the preemption language of the ICCTA—"with respect to regulation of rail transportation"—with an "uncritical liberalism" would be to commit the mistake cautioned against in the passage quoted above.

3. Application to the facts at hand

▮ Upon review of the principles governing preemption, we are not prepared to find that the city's application of its zoning and occupational licenses is precluded. The ordinances at issue are not aimed at the railroad or rail operations, but rather are generally applicable exercises of a city's police powers to safeguard the health and safety of its citizens. If a city finds that a particular operation is being run in violation of its laws it should be able to step in, especially where, as here, it believes the operation is having a harmful impact upon its residents. The presumption against finding traditional police powers preempted supports this view and reflects the Supreme Court's acknowledgment of the importance of such powers

and the desirability of preserving local control over certain functions. Moreover, we question whether application of the ordinances under the circumstances here interfere with rail operations. As discussed more fully below, the City merely prohibited Rinker from running a distribution operation for its own ends, not from running a rail operation. Finally, the Surface Transportation Board has recognized that "not all state and local regulations that affect railroads are preempted." *New York Susquehanna and W. Ry. Corp.*, STB Fin. Docket No. 33466, 6 (Sept. 9, 1999) (hereafter *"Riverdale"*). *Riverdale* cited a law prohibiting railroads from dumping their wastes into the local waterways as an example of a non-preempted exercise of police powers. *Id.* Unlike the ordinances at issue here, such laws are aimed directly at railroads and their operations.

While we discern no bright line standard as to how the ICCTA operates with respect to generally applicable local zoning and occupational licensing laws that do not target but which may affect railroad operations, we need not reach that issue here. This is so because the City's enforcement of its zoning ordinance and licensing requirement under these circumstances is not "with respect to regulation of rail transportation" under the ICCTA. 49 U.S.C. § 10501(b)(2). FEC and Rinker were not involved in "rail transportation" or even activities related to rail transportation[2] at the 15th Street yard; rather, FEC and Rinker entered into an arrangement whereby Rinker, FEC's largest customer, would operate an aggregate distribution operation on FEC property. Its genesis was a real estate transaction—a land swap initiated by Rinker at a time railway operations were being discontinued. Like the

replacement of the Rinker sign by an FEC sign only after the appearance of city inspectors, railway operations appear to be an after-the-fact justification rather than the impetus for the project.

The arrangement was beneficial to both parties: FEC would be able to extract income from property that lay dormant after becoming unprofitable and Rinker could move its operations to a more convenient location. FEC and Rinker calculated that the operation's proximity to the railroad and connection to FEC would shield it from local regulation.[3] Finding the operations to fall outside the scope of the ICCTA and thus preemption not to apply, the Court denies FEC the declaration and injunction it seeks.

Little guidance exists as to whether Rinker's operations constitute "rail transportation" because of the unique circumstances of Rinker's arrangement with FEC: Rinker, a non-rail carrier, conducts a distribution operation on property owned by a rail carrier, solely for its own benefit and free of the rail carrier's involvement or control. The district courts and the single circuit court of appeal, *see City of Auburn v. United States Government*, 154 F.3d 1025 (9th Cir.1998), that have considered the reach of ICCTA's preemption clause have not dealt with whether a particular operation is covered by the clause. Only the STB in *Riverdale* has attempted to distinguish non-transportation facilities from covered transportation facilities and did so with the caveat that it did not have enough information to make a final determination in that particular case. *Riverdale*, STB Fin. Docket No. 33466 at 7.

In arguing that the operations at 15th Street fall within the ICCTA's preemptive

---

**2.** Without citing to the statute, FEC declares in its post-trial brief that "[t]he ICCTA refers not to whether a property or service is 'rail transportation' but rather to whether it is 'related to transportation by rail.'"

**3.** At trial, the City argued that even were FEC to take command of operations at 15th Street,

its regulations would not be preempted. The Court does not address this matter because we do not know enough about the nature of such an operation. The scenario initially presented to the Court and addressed in detail in the pleadings and at trial involved Rinker-run operations on FEC property.

reach, FEC and Rinker rely on the Act's broad definition of "transportation." "Transportation" includes, in pertinent part, a yard or facility "related to the movement of ... property ... by rail, regardless of ownership or an agreement concerning use" and services related to the movement, receipt, transfer in transit, storage, and handling of property. 49 U.S.C. § 10102(9)(A) & (B).[4] We are not convinced that this language, as broad as it is, supports FEC's and Rinker's position. As used by Rinker, the 15th Street yard is not "related to the movement of ... property," for the Act as a whole is concerned with the "rail transportation system," not one company's distribution of its product. *See* 49 U.S.C. § 10101 (setting forth the policy considerations underlying the ICCTA). "[M]ovement of property" suggests an operation devoted to moving the goods of any customer willing to pay for the service. Rinker is not in the business of moving goods by rail; its operations are directed solely at moving its own product. There is no indication that under the FEC–Rinker arrangement the 15th Street facility is available for the movement of non-Rinker goods. The City's expert, Richard J. Schiefelbein, suggests the lessees and purchasers who have traditionally entered into lease arrangements with railroads are "those whose business activities involve shipping by rail." Schiefelbein Narrative Direct at 19.

Unpersuaded that reference to the language of the ICCTA conclusively settles the matter, we turn for guidance to the STB's decision in *Riverdale*,[5] which as indicated above is the only opinion to discuss transportation versus non-transportation facilities. *Riverdale*, in a section of the opinion entitled "Non–Transportation Facilities," recognizes that "manufacturing activities and facilities not integrally related to the provision of interstate rail service are not subject to [STB] jurisdiction or subject to federal preemption." *See Riverdale*, STB Fin. Docket No. 33466 at 7. Because the STB found that the record before it lacked sufficient information to determine whether the particular plant before it was actually a non-transportation processing plant or some sort of transloading operation related to transportation services, the Court does not have the benefit of the STB's application of its principle. *Id.*

Rinker is not processing or manufacturing aggregate at 15th Street, but rather distributing it. However, we find that Rinker's distribution activities are not "integrally related to the provision of interstate rail service." In reaching this conclusion, the Court relies in part on the narrative direct testimony of the City's expert, Mr. Schiefelbein. Mr. Schiefelbein maintains that 15th Street could continue to be used as a transportation facility in

4. FEC devotes significant space in its post-trial brief to arguing that the 15th Street operations fall within the scope of the ICCTA's preemption clause whether conducted by FEC or Rinker. The Court agrees that the phrase "regardless of ownership or an agreement concerning use" suggests that the distinction is meaningless. 49 U.S.C. § 10102(9)(A). However, the Court need not speak definitively on this point, having based its conclusion on the nature of the operation, not who was at the helm.

5. The ICCTA abolished the Interstate Commerce Commission ("ICC") as part of the Act's deregulation of the rail and motor carrier industries. H.R.Rep. No. 104–311, at 82. In its place, the ICCTA created the Surface Transportation Board ("STB") to perform

many of the function the ICC had performed. *See Norfolk Southern Ry. Co. v. City of Austell, Georgia*, 1997 WL 1113647, No. CIVA1:97–CV–1018–RLV *4 (N.D.Ga. Aug. 18, 1997). "[A]s the agency with authority delegated from Congress to implement the provisions of the ICCTA, the STB is uniquely qualified to determine whether state law or local law should be preempted ...." *Id.* at *6 (citing *CSX Transp., Inc. v. Georgia Public Service Com'n*, 944 F.Supp. 1573, 1584 (N.D.Ga. 1996)); *see also Hayfield Northern R.R. Co. v. Chicago & North Western Transp. Co.*, 467 U.S. 622, 634, 104 S.Ct. 2610, 81 L.Ed.2d 527 (1984) (citing *Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Authority*, 464 U.S. 89, 97, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983)).

the face of the City's regulations. Schiefelbein Narrative Direct at 15. According to Mr. Schiefelbein, the City has not prohibited FEC from delivering rail cars to the tracks at the 15th Street facility or Rinker from unloading the aggregate into trucks for movement to Rinker customers or Rinker facilities. *Id.* He describes such an arrangement as "a traditional 'team track' situation" in which "a railroad delivers cars to one of its tracks and the consignee unloads the commodity from those cars into a vehicle to take the commodity to the consignee's location." *Id.* He contrasts the City's actions as merely prohibiting Rinker from performing an aggregate distribution business on property not zoned for such activity. *Id.*

By contrasting Rinker's operations at 15th Street with what he labels intermodal operations—such as FEC's former container operations there, which he concedes were covered by the ICCTA—Mr. Schiefelbein clarifies this point. Mr. Schiefelbein describes an intermodal operation as follows:

> Railroads operate intermodal terminals themselves or hire contractors to perform those functions for them. Railroads unload the trailers and containers from the rail cars; consignees do not. Railroads control the gate function at intermodal terminals, and provide security for and bear liability for the trailers, containers, and enclosed cargoes while they are in the intermodal terminal. Depending on the shippers' preferences, railroads can deliver the trailer or container by rubber tire to the consignee's location or the consignee may send a truck to pick up the trailer or container itself.

Schiefelbein Narrative Direct at 17. In this case, FEC provided the rail services and Rinker performed all the other associated functions: FEC moved the aggregate by rail from Miami to West Palm Beach, where, upon arrival at 15th Street, Rinker, the consignee, took over. Rinker (or Herzog, with whom Rinker contracted), not FEC, unloaded the rail cars. Rinker controlled the gate to and provided security over its leased portion of the yard and bore liability for the aggregate—its aggregate—stored at the yard.

The Court leaves a more precise interpretation of "rail transportation" and analysis of what activities are "integrally related to the provision of interstate rail service" to the Surface Transportation Board. Whatever operation of a transportation facility entails, Rinker's operation is not it. At a minimum, it seems to require being in the business of providing rail transportation services and controlling the provision of those services. Rinker is not in the business of moving property by rail for paying customers. The operation just happens to be located on railroad property. Rinker is its own and only customer, functioning as the shipper and consignee. Rinker merely receives from FEC rail shipments of its own aggregate, stores the aggregate, and eventually distributes it to its other facilities or customers. Rinker does not operate, as FEC and Rinker contend, an intermodal facility.

## IV. Conclusion

Informed by the testimony and exhibits presented during the two-day bench trial and upon review of the parties' pre- and post-trial submissions, it is hereby ORDERED AND ADJUDGED, for the reasons set forth above, as follows:

1. FEC's request for a declaratory judgment is **DENIED.**

2. FEC's request for injunctive relief is **DENIED.**

3. The City's request for a declaratory judgment is **GRANTED.** The Court finds that the Interstate Commerce Commission Termination Act does not preempt the City's enforcement of its occupational license and zoning ordinances.