ENGELHARD CORPORATION

v.

SPRINGFIELD TERMINAL RAIL-
WAY COMPANY and Consoli-
dated Rail Corporation.

No. Civ.A. 01–10829–RGS.

United States District Court,
D. Massachusetts.

April 2, 2002.

Catherine M. Campbell, Feinberg, Campbell & Zack, P.C., Boston, MA, Henry M. Wick, Vincent P. Szeligo, Wick, Streiff, Meyer, O'Boyle & Szeligo, P.C., Pittsburgh, PA, for plaintiff.

Jonathan M. Broder, David C. Ziccardi, Philadelphia, PA, Michael B. Flynn, Flynn & Associates, P.C., Boston, MA, for Consolidated Rail Corp., defendant.

Eric L. Hirschhorn, Winston & Strawn, Washington, DC, Robert B. Culliford, Springfield Terminal Railway, N Billrica, MA, for Springfield Terminal Railway Co. Inc., defendant.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

STEARNS, District Judge.

This case involves the alleged non-payment of "car mileage allowances" generated by the movement of privately-owned tank cars over a 155 mile stretch of railway track between Selkirk, New York and Barber, Massachusetts, by two railroads, defendant Consolidated Rail Corporation

(Conrail), and defendant Springfield Terminal Railway Corporation (Springfield Terminal). The track is owned by Conrail and shared with Springfield Terminal under an Interchange Agreement.[1]

Plaintiff Engelhard Corporation supplies kaolin, a fine white clay commonly used in the manufacture of porcelain. The clay is mined in Georgia and delivered to various destinations in the northeastern United States in specially built tank cars. Contrary to what might be expected, railroads do not typically supply specialized cars. Rather, as one court has explained:

> Railroads, pursuant to their common-carrier obligations under the Interstate Commerce Act, must provide railcars suitable for the transportation of a broad range of property, including agricultural products, flammable liquids, as well as crated freight. In part because of these diverse requirements, it has proved impracticable for rail common-carriers to invest the capital necessary for the acquisition of general-use and specialty rolling stock. Carriers, therefore, commonly lease railcars both from firms in the business of supplying railcars and, occasionally, from shippers themselves. Under these leasing arrangements, railroads fulfill their common-carrier obligation to make available suitable railcars by paying car providers

their costs of owning the rolling stock through a variety of means, including direct "mileage allowances" and offsets on line-haul freight tariffs.

*General American Transp. Corp. v. ICC,* 872 F.2d 1048, 1050 (D.C.Cir.1989).

Engelhard supplies its customers not only with kaolin, but also provides the specialty tank cars required for its transport. All of this is a matter subject to intricate regulation. Railroads historically were second only to the nuclear power industry in the pervasiveness of their regulation by the State, an enduring if diminished legacy. At the apex of the regulatory system is the Surface Transportation Board (STB), the successor agency to the venerable Interstate Commerce Commission (ICC). The STB implements the directives of the Interstate Commerce Commission Termination Act of 1995 (ICCTA), 49 U.S.C. §§ 10101–11908,[2] which as its Title implies, was intended to eliminate government oversight over many, but by no means all, aspects of railway freight service. One such aspect is the "car mileage allowance." The STB remains responsible for setting allowance rates based on the features of a particular rail car. 49 U.S.C. § 11122.[3]

Before the court are motions to dismiss an Amended Complaint brought by Engel-

---

**1.** Railroads are required by law to provide "through routes" for competitors' cars over their proprietary tracks in the interest of promoting an integrated national freight system. 49 U.S.C. §§ 10703 and 10742. This obligation is typically discharged by voluntary agreements among railroads. *See Southern Ry. Co. v. Louisville & Nashville Railroad Co.,* 185 F.Supp. 645, 651–652 (W.D.Ky.1960), *aff'd,* 289 F.2d 934 (6th Cir.1961).

**2.** The ICCTA substantially amended Subtitle IV of Title 49 of the United States Code as it appeared prior to 1995. Subtitle IV, Part A of which governs rail commerce, is often referred to as the Interstate Commerce Act.

**3.** Section 11122(b) states in relevant part:

> The rate of compensation to be paid for each type of freight car shall be determined by the expense of owning and maintaining that type of freight car, including a fair return on its cost giving consideration to current costs of capital, repairs, materials, parts, and labor. In determining the rate of compensation, the Board shall consider the transportation use of each type of freight car, the national level of ownership of each type of freight car, and other factors that affect the adequacy of the national freight car supply.

hard seeking to collect unpaid mileage allowances from the defendant railroads. The standards to be applied in reviewing a motion to dismiss are familiar. "We must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss." *Vartanian v. Monsanto Co.*, 14 F.3d 697, 700 (1st Cir. 1994). A court must, of course, be satisfied that a complaint contains "factual allegations, either direct or inferential, respecting each material element necessary to sustain a recovery under some actionable legal theory," *Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996), and need not consider unsupported assertions and mere legal conclusions. *See Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1216 (1st Cir.1996). Ordinarily, in making its assessment, the court is to confine itself within the four corners of the complaint. There is, however, an exception. Where factual allegations in the complaint are based on documents whose authenticity is not questioned, the court may look to these documents as well. *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33–34 (1st Cir.2001).[4]

According to the Amended Complaint, Engelhard amassed a fleet of specially built tank cars for use in transporting its clay. Some of these cars were owned by Engelhard outright, while many were leased from other car owners who authorized Engelhard to collect the accrued mileage allowances. Beginning in 1990, Springfield Terminal and Conrail hauled kaolin over the disputed 155 mile segment of track to customers in New England in tank cars supplied by Engelhard. While

Conrail consistently credited Engelhard with mileage allowances for tank cars transited to Selkrik, New York, and while Springfield Terminal did the same for tank cars taken beyond Barber, Massachusetts, in a number of instances, neither railroad paid the allowance for cars hauled between the two stations. When questioned by Engelhard, Conrail claimed that Springfield Terminal was responsible for the payments, while predictably, Springfield Terminal put the onus for the payments on Conrail.

Engelhard filed this action on May 15, 2001, seeking $568,155.13 in unpaid mileage allowances. Engelhard maintains that while Springfield Terminal "is not authorized to perform rail carrier service over its length [the disputed 155 mile segment], in some instances [Springfield Terminal] has accepted responsibility for and paid mileage allowances pursuant to a March 31, 1990 Haulage Agreement." Amended Complaint ¶ 13. Despite Springfield Terminal's intermittent payments, the Amended Complaint asserts that Conrail remains primarily responsible for payment of the overdue car mileage allowances.

> Said Haulage Agreement has not altered Conrail's rail common carrier status for transportation over the 155 mile segment. Although Conrail reached a private agreement with a subcontractor [Springfield Terminal] to assist it with operations over this segment, it ultimately retains liability for movements handled on its behalf pursuant to the Haulage Agreement.

Amended Complaint ¶ 24.

The "Haulage Agreement" referenced in the Amended Complaint is an Interchange Agreement entered into between Conrail

---

4. The Amended Complaint contains a number of documents appended as exhibits. The defendants have also submitted a copy of the full text of the Interchange Agreement between

Conrail and Springfield Terminal. The parties do not dispute the authenticity of these documents, although they do differ about their meaning.

and Springfield Terminal on March 31, 1990, permitting Springfield Terminal to transit cars, either made up in Conrail trains or in trains of its own, over Conrail's Selkirk to Barber line. The Agreement provides, inter alia, for the division of the revenues earned and the expenses incurred in the joint hauling of cars. It is also apparent that a disagreement between Conrail and Springfield Terminal over the interpretation of this aspect of the Agreement is the reason for the erratic payment of mileage allowances to Engelhard. H. Jeffrey Miller, Springfield Terminal's Revenue Manager, responded to Engelhard's inquiries about the erratic payments with the explanation that

> I have given you the two possible scenarios for traffic moving eastward from CR to ST. If the route states CR–ROTTJ ST, then ST divisions of revenue and liability for carhire mileage begins at Selkirk, NY. ST pays mileage between Selkirk and Barber's Station. Conrail is hauling the cars but the cars remain in ST's account for both revenue and carhire as per the haulage agreement.

> If the route states CR–BRBER ST, then ST divisions of revenue and liability for carhire mileage begins at Barber's Station, Ma. The carhire from Selkirk to Barber's Station remains in the account of Conrail. This is not a haulage move and the haulage agreement does not apply. Traffic moving westward from ST to CR works the same way.

Amended Complaint, Ex. M.

Conrail, on the other hand, told Engelhard that the Interchange Agreement "placed responsibility for all such moves [between Selkirk and Barber] on Springfield Terminal, regardless of which railroad actually moved the car or received a division of freight rates on the segment." Amended Complaint, ¶ 29.[5]

The court heard argument on defendants' motions to dismiss the original Complaint on October 24, 2001. As the parties refined their positions during the course of the hearing, it became apparent that two issues of law were ripe for adjudication: (1) Are Engelhard's state-law claims preempted by section 10501(b) of the ICCTA?; (2) If so, which of the ICCTA's statutes of limitations applies to Engelhard's claims of non-payment? At the conclusion of the hearing, the court gave Engelhard twenty-one days to file an Amended Complaint sharpening the focus of its state-law claims. Engelhard did so on November 14, 2001.[6] Thereafter, defendants renewed their motions to dismiss and the parties filed supplemental memoranda directed to the two issues ripe for adjudication.

## DISCUSSION

### Preemption

■ "Congress's intent is the touchstone of preemption analysis." *Mendes v. Medtronic Inc.*, 18 F.3d 13, 16 (1st Cir. 1994). "Such intent may be expressed either explicitly, in the language of a statute, or implicitly, through passage of a statutory scheme that extensively occupies the field or where the purpose and objectives of federal law would be frustrated by state

---

5. As previously noted, Engelhard's position is that Conrail is responsible for payment of the allowances. Amended Complaint ¶¶ 17, 18 and 24.

6. The Amended Complaint contains five counts: Count I—Violation of the Interstate Commerce Act (Alternative theory); Count II—Breach of Implied–In–Fact Contract Arising From Course of Dealings (Alternative Theory); Count III—Breach of Implied–In–Fact Contract Arising From Promissory Estoppel (Alternative Theory); Count IV—Quantum Meruit (Unjust Enrichment); and Count V—Breach of Contract for Benefit of Third Party Beneficiary.

law." *Talbott v. C.R. Bard, Inc.*, 63 F.3d 25, 27 (1st Cir.1995). Section 10501(b) of the ICCTA states:

> [t]he jurisdiction of the [Surface Transportation] Board over (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services and facilities of such carriers; ... is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

The concluding sentence of section 10501(b) is an unmistakable statement of Congress's intent to preempt state laws touching on the substantive aspects of rail transportation.

In 1995, Congress eliminated what little remained of state and local regulatory authority over railroad operations through enactment of the Interstate Commerce Commission Termination Act ("ICCTA" or "the Act"), codified at 49 U.S.C. § 701 *et seq.* As one federal district court has stated with respect to the ICCTA, "It is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations." *CSX Transp., Inc. v. Georgia Public Service Comm'n*, 944 F.Supp. 1573, 1581 (N.D.Ga.1996). Indeed, the Act's legislative history makes plain Congress's intent to shield railroads from state regulation while at the same time lessening federal regulation of the railroad industry.

> Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass *all* such regulation and to be completely exclusive. Any other construction would undermine the uniformity of Federal standards and risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation.

H.R.Rep. No. 104–311, at 96 (1995), U.S.Code Cong. & Admin.News 1996, P. 793 (emphasis in original). *Florida East Coast Ry. Co. v. City of West Palm Beach*, 110 F.Supp.2d 1367, 1373–1374 (S.D.Fla.2000), *aff'd*, 266 F.3d 1324 (11th Cir.2001). *See also Pejepscot Industrial Park, Inc. v. Maine Central Railroad Co.*, 215 F.3d 195, 202 (1st Cir.2000).[7]

As broad as is preemption under the ICCTA, there are limits to its reach. Preemption, absent clear evidence of a contrary intent on the part of Congress, will not encroach on areas traditionally subject to the historic police powers of the States. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996). *See Florida East Coast Ry. Co., supra*, 110 F.Supp.2d at 1376 (while the preemptive reach of the ICCTA is broad, it does not oust a city's powers to enforce non-discriminatory occupational licenses and zoning ordinances). The issue presented here is whether Congress has chosen to occupy the transportation field insofar as car mile-

---

7. The First Circuit in *Pejepscot*, while acknowledging the powerful preemptive effect of the concluding sentence of section 10501(b), was addressing a different issue, whether the first sentence of section 10501(b), by vesting "exclusive" jurisdiction over the remedies provided by Part A in the STB, thereby divested the district court of concurrent jurisdiction. The Court held that it did not, at least with respect to the claim at issue in that case. The Court did not, as Engelhard suggests, hold that the state law claims in *Pejepscot* survived preemption. Rather, it remanded the state law claims for a ruling by the district court, which had declined to exercise supplemental jurisdiction in the mistaken belief that it lacked federal subject matter jurisdiction.

age allowances are concerned by creating an exclusive federal remedy for their non-payment. I conclude that a study of the interplay of those sections of the ICCTA that touch directly or indirectly on the mileage allowance issue indicates that Congress clearly has.

Section 10501(b) of the ICCTA refers in the first instance to the exclusivity of the remedies provided by this "part," that is, by Part A of Subtitle IV of Title 49. As a general matter, section 11704(b) authorizes the imposition of liability on a rail carrier whose acts or omissions in violation of Part A result in damages to a "person." Section 11704(c)(1) in turn authorizes an injured "person" to bring an action for damages either before the STB or in the district court. *See Pejepscot*, 215 F.3d at 199–200. With respect to car mileage allowances, section 11122(a) directs the STB to establish rates of compensation for the use by a rail carrier of third-party freight cars. Similar authority is found in section 10745,[8] which authorizes the STB to "establish a charge or allowance for transportation or service for property when the owner of the property, directly or indirectly, furnishes a service related to or an instrumentality used in the transportation or service." The predecessor ICC exer-

cised this authority in promulgating Freight Tariff 6007, which establishes compensation rates for the use of tank cars, as well as rules for the filing, processing and protest of mileage allowances. This interplay of remedial statutes and regulation leads inescapably to the conclusion that Congress has occupied the field of car mileage allowances so completely as to preempt any potentially parallel state-law remedy. I therefore rule that Counts II–V of the Amended Complaint are preempted by the ICCTA and must therefore be dismissed.[9]

*Statute of Limitations*

■ Since Springfield Terminal's viable federal claim is brought under ICCTA § 11704(b), the two-year statute of limitations of 49 U.S.C. § 11705(c) applies to its non-payment count. Section 11705(c) requires a "person" seeking damages under section 11704(b) to file a complaint with the STB "within 2 years after the claim accrues." While section 11705(c) refers only to the filing of complaints before the STB, its statute of limitations applies to section 11704(b) actions before the district court as well. *See Aluminum Ass'n, Inc. v. Atchison, Topeka & Santa Fe Railway. Co.*, 746 F.Supp. 207, 213 n. 18 (D.D.C. 1990).[10] It is worth noting that the STB

8. Section 10745 is modeled on section 10747 of the pre-amendment Interstate Commerce Act. *See Bud Antle, Inc. v. United States*, 593 F.2d 865, 869 (9th Cir.1979).

9. Engelhard's principal argument against preemption is that Conrail and Springfield Terminal, by entering into the Interchange Agreement, contracted themselves out of the regulatory framework imposed by the ICCTA. While this is an extremely doubtful proposition on many levels, even were it correct, Engelhard is neither a party to the Interchange Agreement nor its intended beneficiary. Moreover, Engelhard is able to plead a contractual or quasi-contractual measure of damages only by reference to the compensation schedule set out by the STB in Freight Tariff 6007. Engelhard's secondary conten-

tion that the Interchange Agreement falls within section 10709 of the ICCTA, which preserves state-law remedies for breaches of agreements between railroads and purchasers of rail services, is even more puzzling. Engelhard is neither a railroad nor a purchaser of shipping services, as it admits. *See* Amended Complaint ¶ 40. At most, the Interchange Agreement may make state-law remedies available to the contracting railroads in disputes over matters of contribution and the like that may be related to the railroads' mileage allowance obligations. It does nothing of the sort for Engelhard.

10. While the First Circuit in *Pejepscot* suggested that the four-year general limitations period of 28 U.S.C. § 1658 might apply to section 11704(b) claims, *id*, 215 F.3d at 202 n. 5, as

has incorporated the two year statute of limitations of section 11705(c) into Freight Tariff 6007. Item 182 of the Tariff states that

> [a] private car owner must, within twenty-four (24) months from the last day of the month the completed cycle was reported, present any claim for mileage allowance discrepancies, including incorrect rates or omissions, to the applicable rail carrier in the prescribed AAR format.... The railroad receiving the claim must within the four (4) months from the date on which the claim was presented allow it in whole or in part, or decline it. The private car owner may reissue its claim, if applicable within four (4) months from the last day of the four (4) months' period allowed the railroad which handled the claim prior to reissuance. The railroad receiving the reissue claim must within four (4) months from the date of which the reissued claim was presented allow it in whole or in part or decline it. If the railroad fails to handle the original or reissued claim within the prescribed time limits, it will constitute a valid claim as last presented and must be honored by the railroad to which presented. Claims for amounts of $25.00 per car per cycle or less shall not be issued. The $25.00 limit is not applicable where no miles were reported for the railroad cycle.

### Primary Jurisdiction

■ The remaining question is whether this court should invoke the primary jurisdiction doctrine to refer certain aspects of this case to the STB for guidance. As explained by the First Circuit in *Pejepscot:*

> The primary jurisdiction doctrine is intended to "serve[ ] as a means of coordinating administrative and judicial machinery" and to "promote uniformity and take advantage of agencies' special expertise." *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 580 (1st Cir. 1979). This court relies on three factors to guide the decision on whether to refer an issue to an agency under the primary jurisdiction doctrine:
>
> > (1) whether the agency determination l[ies] at the heart of the task assigned the agency by Congress; (2) whether agency expertise [i]s required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court.
>
> *Blackstone Valley Elec. Co.*, 67 F.3d at 992 (quoting *Mashpee Tribe*, 592 F.2d at 580–81) (alterations in original).

*Id.*, 215 F.3d at 205.

Here, the first and third of the *Mashpee Tribe* criteria counsel referral. I will, therefore, subject to a caveat, stay this action and refer two questions to the STB for preliminary determination: (1) Does a cause of action involving a disputed failure to pay Tariff 6007 car mileage allowances arise one month and ten days after the payment comes due, or four months from the date on which a railroad refuses to pay or act on a claim, or some other date? (2) Is a railroad obligated to pay compensa-

Springfield Terminal points out, that statute applies only to statutes enacted after December 1, 1990, and not to preexisting statutes amended subsequent to that date. *See Zubi v. AT & T Corp.*, 219 F.3d 220, 222, 225 (3d Cir.2000). The section 11705(a) three-year statute of limitations applies only to actions brought by rail carriers seeking to recover

charges for transportation services. *Pejepscot*, 215 F.3d at 199; *Atchison, Topeka and Santa Fe Railway Co. v. Benchcraft, Inc.*, 381 F.Supp. 603 (W.D.Mo.1974). Engelhard is not a "rail carrier." A "rail carrier" is "a person providing common carrier railroad transportation for compensation...." 49 U.S.C. § 10102.

tion only to the owner of a car's reporting mark, or does Item 180 of Tariff 6007 permit the owner of the mark to assign the right to payment to a lessee like Engelhard?

The caveat is this. The parties represent to the court that opportunities for discovery and factual elucidation are limited under the rules of the STB. If it will aid the parties' presentation to the STB and the ultimate resolution of this dispute, I will enter a discovery schedule of up to 120 days duration at the parties' request before making the referral and staying the district court case.

## ORDER

For the foregoing reasons, Counts II, III, IV and V of the Amended Complaint are *DISMISSED* as preempted by the ICCTA. It is further *ADJUDGED* and *DECLARED* that the two-year statute of limitations of 49 U.S.C. § 11705(c) applies to Count I of the Amended Complaint. The parties will have fourteen (14) days from the date of this Order to submit a joint request for specified discovery to be conducted before any referral to the STB, and any suggestions for refinement or supplementation of the issues identified in this opinion as being appropriate for referral.

SO ORDERED.